**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| PUBLIC SCHOOL RETIREMENT SYSTEM OF THE SCHOOL DISTRICT OF KANSAS CITY, MISSOURI, derivatively on behalf of Nominal Defendant ABBOTT LABORATORIES,<br><br>       Plaintiff,<br><br>  v.<br><br>MILES D. WHITE, H. LAURANCE FULLER, ROXANNE S. AUSTIN, W. JAMES FARRELL, SAMUEL C. SCOTT, III, GLENN F. TILTON, WILLIAM A. OSBORN, ROBERT J. ALPERN, JEFFREY LEIDEN, WILLIAM DALEY, W. ANN REYNOLDS, DAVID OWEN, ROY ROBERTS, WILLIAM SMITHBURG, BOONE POWELL, JR., JACK GREENBERG, JOHN WALTER, ADDISON RAND, DAVID JONES, THOMAS C. FREYMAN, RICHARD A. GONZALEZ, MARY SZELA, JAMES TYREE, WILLIAM G. DEMPSEY, HOLGER LIEPMANN, JOHN LANDGRAF, DAVID GOFFREDO, and P. LOREEN MERSHIMER,<br><br>       Defendants,<br><br>and<br><br>ABBOTT LABORATORIES,<br><br>       Nominal Defendant. | C.A. No._____<br><br><br>JURY TRIAL DEMANDED |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................ 1

JURISDICTION AND VENUE ................................................................................. 5

THE PARTIES ........................................................................................................... 6

    A.    Plaintiff ........................................................................................ 6

    B.    The Nominal Corporate Defendant................................................ 6

    C.    The Board of Directors ................................................................. 6

    D.    Former Board Members................................................................ 7

    E.    Senior Executives...................................................................... 10

    F.    Former Senior Executives .......................................................... 11

FACTUAL BACKGROUND .................................................................................. 12

    A.    Abbott's Marketing Strategy...................................................... 12

    B.    Applicable Laws and Regulations Governing Abbott's Operations .................... 13

        1.    FDA Regulation of Drug Marketing and Promotion ................................. 13

            a.    The FDA Regulates What Drugs May be Marketed, and the Uses for Which They May be Marketed....................................... 13

            b.    FDA Regulations Prohibit Off-Label Marketing and False and Misleading Statements About a Drug's Use. ......................... 14

        2.    Prescription Drug Reimbursement Under Medicaid and Other Federal Health Care Programs ................................................. 15

        3.    The Anti-Kickback Statute ....................................................... 16

    C.    Abbott's Illicit Marketing Practices Have Been the Target of Multiple Investigations ................................................................. 17

        1.    An Abbott Subsidiary Gets Investigated, and Settles With the U.S. Government for Defrauding Medicare and Medicaid............................. 17

        2.    As the TAP Investigation and Settlement Were Coming to a Close, the Government Turned its Sights to Abbott ............................ 19

3.      Shareholder Derivative Suits Arise From the Settlements of the
2001 TAP Investigation and the 2003 Ross Investigation ........................ 21

4.      Abbott Settles A Third Derivative Litigation Arising From the
Company's Illegal Conduct .................................................................... 22

D.      Fiduciary Duties of Abbott's Management and Board ......................................... 23

E.      Abbott Board Duties and Policies Created From the Various Derivative
Litigation Settlements ......................................................................................... 29

1.      The Abbott CIA (imposed in 2003) ........................................................ 29

2.      Modifications to the Public Policy Committee Charter (2004 and
2005) ...................................................................................................... 31

F.      Abbott Illegally Promotes Off-Label Uses of Depakote, Causing the
Company to Reserve $1.5 Billion In Anticipation of Settling the
Government Investigation ...................................................................................... 33

1.      The Criminal Promotion of Depakote ....................................................... 33

a.      Abbott Creates the LTC Group .................................................... 35

b.      Abbott's Management Trains its Sales Force to Manipulate
Healthcare Professionals ............................................................. 38

c.      Abbott Funds Clinical Practice Guidelines to Deceive
Healthcare Professionals ............................................................. 40

d.      Abbott Improperly "Details" the Depakote Products .................. 42

i.      Abbott Targets P&T Committees ..................................... 43

ii.     Abbott Utilizes In-Services to Promote the Off-
Label Use of the Depakote Products................................. 44

iii.    Abbott's "Decile" Ranking System .................................. 44

e.      Abbott Exploits OBRA-87 Limits to Promote the Depakote
Products....................................................................................... 45

f.      Abbott Backs the Depakote Products With Misleading
Clinical Studies ............................................................................ 46

i.      The Failed Tariot 738 Study ............................................ 46

ii.     The Unfounded Manji Article........................................... 47

           iii.    Abbott Illegally Sponsors the Porsteinsson 817 Study ............................................................................ 48

           iv.    Dr. Tariot Reconsiders the Findings From His 738 Study, But Abbott Ignores the Truth................................. 49

    g.    Abbott Uses Medical Journal "Supplements" to Promote the Depakote Products .................................................. 50

    h.    Abbott Bribes "Key Opinion Leaders" to Increase Sales of the Depakote Products .................................................. 51

    i.    Abbott Sets Up Speaker Presentations Rife With Off-Label Promotions ................................................................... 52

    j.    Abbott Uses CMEs as Promotional Events for the Depakote Products........................................................................... 53

    k.    The LTC Sales Force Falsify Medical Education Requests for Off-Label Information About the Depakote Products............. 54

    2.    The Government Launches Its Investigation Into Depakote ................... 55

    3.    Abbott and the DOJ Engage in "Active" Settlement Negotiations, and Abbott Sets Aside $1.5 Billion in Anticipation of Settlement .......... 56

  G.    Defendants Were Twice Warned About Off-Label Marketing of Depakote as well as Other Drugs .......................................................... 58

  H.    Additional Illegal Marketing Activities May Put Abbott at Risk of Exclusion from Federal Programs ....................................... 59

DEMAND ON THE BOARD OF DIRECTORS WOULD BE FUTILE ................................... 60

COUNT I ................................................................................................................... 63

COUNT II .................................................................................................................. 64

RELIEF REQUESTED................................................................................................... 65

The Public School Retirement System of the School District of Kansas City, Missouri ("Plaintiff"), by and through its undersigned counsel, hereby makes the following allegations in its Verified Derivative Complaint (the "Complaint") on behalf of Abbott Laboratories ("Abbott" or the "Company"), as the nominal defendant, against certain current and former directors (the "Board" or the "Director Defendants") and senior executives (the "Executive Defendants") of Abbott (collectively, the "Defendants"). The allegations herein are based upon Plaintiff's personal knowledge as to its own acts, and on information and belief, including the investigation of counsel and review of publicly available information, as to all other matters.

## INTRODUCTION

1.      This derivative action stems from the Defendants' role in a decade-long criminal marketing practice that ran rampant throughout the entire Company. On October 19, 2011, Abbott disclosed in a Form 8-K filed with the U.S. Securities and Exchange Commission (the "SEC") that, as a result of this practice, it was forced to *set aside a $1.5 billion reserve* (the "Reserve") to cover potential liabilities relating to a U.S. Department of Justice (the "DOJ") investigation (the "Government Investigation") into the sales and marketing of Abbott's flagship seizure drug Depakote® ("Depakote").

2.      As detailed in recently-unsealed complaints filed by whistleblowers Thomas Spetter (the "Government Complaint") and Susan Mulcahy, Doreen Merriam, Sondra Knowles, Meredith McCoyd, and Tamara Dietzler, former Abbott sales representatives and employees (the "Whistleblower Complaints"), the Company engaged in a systematic campaign to illegally promote Depakote, Depakote Sprinkles®, Depacon®, Depakene®, and Depakote ER® (the "Depakote Products") for "off-label" uses (the "Fraudulent Marketing Scheme"), which resulted in the submission of hundreds of thousands of false claims to federal and state health care programs in violation of federal law. Not only were Abbott sales representatives trained to

1

specifically market the Depakote Products for various impermissible off-label uses, Abbott provided illegal kickbacks to healthcare professionals to increase sales of the Depakote Products, and made false statements to physicians concerning the safety and efficacy of the drugs.

3.     In order to fully capitalize on the Fraudulent Marketing Scheme, Abbott focused its efforts on long-term care ("LTC") facilities, the majority of whose residents are age 65 and older, and thus qualify for prescription reimbursement under federal and state health care programs, including Medicare and Medicaid.  The Fraudulent Marketing Scheme continued for more than 10 years, beginning at least as early as January 1, 1998 and lasting until January 1, 2009.

4.     As discussed in detail below, between October 3, 2001 and January 1, 2009 (the "Relevant Period"), Defendants consciously disregarded multiple red flags, shirking their oversight responsibility at every turn, in order to maximize Company profits.  Moreover, Defendants knowingly permitted the Fraudulent Marketing Scheme despite contractually mandated systems designed to put the Board on notice of the very things that led to the Government Investigation and Reserve.  Most egregiously, certain of the Executive Defendants actually encouraged and participated in the Fraudulent Marketing Scheme.

5.     The anticipated fine that the $1.5 billion Reserve was set aside to absorb marks the third major financial penalty for Abbott or an Abbott subsidiary since 2001, and the second criminal guilty plea for illegal marketing and sales practices in the same period.  Indeed, settlements with the Government in 2001 and 2003, as well as settlements with shareholders in related derivative litigation, have already cost the Company at least $1.5 billion in fines and payouts alone.  Additional more recent settlements in 2010 cost the Company another nearly $200 million.  As a result of the earlier instances of misconduct, Defendants had agreed, through

a Corporate Integrity Agreement ("CIA"), to establish and administer internal compliance mechanisms to directly inform the Board of the Company's compliance or non-compliance with drug marketing laws.  Moreover, as a result of the derivative settlement agreements, Abbott's Public Policy Committee was specifically tasked with creating and monitoring a reporting system designed to ensure that the Company remained in regulatory compliance, and if not, to alert the Company's Board.

6.       In 2001, TAP Pharmaceutical Products Inc. ("TAP"), an Abbott joint venture, agreed to pay an *$875 million fine* to the Government to settle allegations that TAP had implemented a marketing scheme through which TAP paid illegal kickbacks to healthcare professionals in order to increase sales of its prostate cancer drug Lupron® ("Lupron").  This $875 million fine consisted of $290 million for TAP's criminal conduct, *$559.5 million to resolve its federal civil False Claims Act liabilities for filing false and fraudulent claims with the Medicare and Medicaid programs*, and $25.5 million to the states for similar fraudulent conduct.  As part of the settlement, TAP also entered into a CIA that imposed requirements as to how TAP supervised its sales and marketing staff and required the company to revise its Medicare and Medicaid reporting practices.

7.       Less than two years later, in 2003, Abbott paid *$614.5 million* to settle federal criminal claims relating to its illegal sales practices.  A Government sting operation netted Abbott employees in the Company's Ross Products Division ("Ross"), who were offering kickbacks to undercover federal agents to purchase Ross's products, and advising them how to fraudulently bill the Government for those items.  As part of the settlement, Abbott also entered into a CIA with the Office of Inspector General ("OIG") of the U.S. Department of Health and Human Services ("HHS") that *required Abbott's Board to engage in regular training and*

*education regarding compliance with all federal health care program requirements, including the federal anti-kickback statute, and on proper and improper promotion, marketing, and sales practices.*

8.     Thus, by 2003, Abbott's Board had agreed to adopt a specific mechanism that reported any non-compliance with health laws directly to the Board.

9.     Even before 2003, however, Defendants were aware that Abbott's improper marketing practices extended far beyond the conduct at issue in the TAP and Ross settlements. Specifically, between 1997 and 2009, Abbott received *at least six Warning Letters* from the Food and Drug Administration's (the "FDA") Division of Drug Marketing, Advertising, and Communications ("DDMAC") concerning improper or unlawful marketing materials that promoted off-label uses of Abbott products.  Moreover, a 1998 Warning Letter sent to Abbott's former Chief Executive Officer and Chairman of the Board, Duane Burnham, provided Defendants with specific notice concerning illegal marketing of the Depakote Products.

10.    Additionally, Abbott settled a shareholder derivative lawsuit in 2004.  Although the underlying allegations of the lawsuit were not directly tied to fraudulent marketing practices, the settlement is nevertheless important to the Board's abdication of responsibility as alleged herein, because it mandated changes to the charter of the Board's Public Policy Committee. Specifically, pursuant to the charter amendment, *the Public Policy Committee was tasked with a responsibility to "assist the Board in fulfilling its oversight responsibility with respect to: public policy, regulatory . . . and government affairs and healthcare compliance issues that affect Abbott."*  The functions of the Public Policy Committee were further enhanced less than a year later, in 2005, when Abbott settled derivative actions arising out of the conduct leading to the above-described TAP and Ross settlements.  The settlement of these actions required Abbott

4

to create a reporting mechanism through which management would inform the Board and Public Policy Committee of healthcare compliance issues, including misconduct such as that alleged in the Fraudulent Marketing Scheme.

11.     Despite every indication that the Company's marketing practices needed to be entirely revamped, Defendants took no corrective action.  Defendants' conduct represents a breach of their fiduciary duties that resulted in significant harm to the Company.  In addition to the enormous fine that Abbott is expected to pay to settle the DOJ claims regarding the Fraudulent Marketing Scheme—which Abbott has set aside the $1.5 billion Reserve to cover— Abbott has incurred substantial legal expenses in defending numerous whistleblower and personal injury actions arising out of its illegal marketing of the Depakote Products, and has relatedly suffered irreversible damage to its reputation.

12.     Defendants knew or should have been aware of the widespread, illegal activities constituting the Fraudulent Marketing Scheme.  That the Board failed to take action to halt these activities is a per se breach of fiduciary duty.  This litigation seeks to hold Defendants accountable for the damage that their conduct has visited and will continue to visit on the Company.

## **JURISDICTION AND VENUE**

13.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds the jurisdictional amount of $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because nominal defendant Abbott is headquartered in this District.  Moreover, a substantial portion of

the occurrences complained of herein occurred in this District.  In addition, one or more of the

Defendants either reside in, or maintain offices in, this District.

## THE PARTIES

### A.      Plaintiff

15.      Plaintiff Public School Retirement System of the School District of Kansas City,

Missouri ("KCPSRS"), a political subdivision of the State of Missouri, is a current shareholder

of the Company, was a shareholder at the time of the misconduct complained of herein, and has

been a shareholder of Abbott continuously since that time.

### B.      The Nominal Corporate Defendant

16.      Nominal defendant Abbott is an Illinois corporation with its principal place of

business in Abbott Park, Illinois.  According to its public filings, Abbott's principal business is

the discovery, development, manufacture, and sale of a broad and diversified line of health care

products.  Abbott employs more than 90,000 people around the world.  The Company conducts

its business both directly and through a number of subsidiary entities.

### C.      The Board of Directors

17.      Defendant Miles D. White ("White") is Abbott's Chief Executive Officer

("CEO") and Chairman of its Board.  White has served as a director of the Company since 1998,

and became its CEO in 1999.  Upon information and belief, White is a citizen of Illinois.

18.      Defendant H. Laurance Fuller ("Fuller") has served as a director of the Company

since 1988.  Fuller has been a member of the Board's Nominations and Governance Committee

since 2003, and currently serves as its Chairman.  Upon information and belief, Fuller is a citizen

of Illinois.

19.      Defendant Roxanne S. Austin ("Austin") has served as a director of the Company

since 2000.  Austin has been a member of the Board's Audit Committee since 2007, currently

serving as its Chairman, and a member of the Board's Public Policy Committee since 2003. Upon information and belief, Austin is a citizen of California.

20.     Defendant W. James Farrell ("Farrell") has served as a director of the Company since 2006. Farrell has been a member of the Board's Nominations and Governance Committee since 2005. Upon information and belief, Farrell is a citizen of Illinois.

21.     Defendant Samuel C. Scott, III ("Scott") has served as a director of the Company since 2007. Scott has been a member of the Board's Audit Committee since 2007. Upon information and belief, Scott is a citizen of Illinois.

22.     Defendant Glenn F. Tilton ("Tilton") has served as a director of the Company since 2007. Tilton has been a member of the Board's Audit Committee since 2007. Upon information and belief, Tilton is a citizen of Illinois.

23.     Defendant William A. Osborn ("Osborn") has served as a director of the Company since 2008. Osborn has been a member of the Board's Nominations and Governance Committee since 2010. Upon information and belief, Osborn is a citizen of Illinois.

24.     Defendant Robert J. Alpern, M.D. ("Alpern") has served as a director of the Company since 2008. Alpern has been a member of the Board's Public Policy Committee since 2009. Upon information and belief, Alpern is a citizen of Connecticut.

25.     Defendants White, Fuller, Austin, Farrell, Scott, Tilton, Osborn, and Alpern are collectively referred to as the "Current Director Defendants."

### D.     Former Board Members

26.     Defendant Jeffrey Leiden, M.D., Ph.D. ("Leiden") served as a director of the Company from 1999 to 2006. In addition, Leiden served as the President and Chief Operating Officer ("COO") of Abbott's Pharmaceutical Products Division from 2001 until 2006. Leiden was a member of the Board's Public Policy Committee in 1999. Leiden also previously served

as a director of TAP Pharmaceuticals, an Abbott joint venture. Upon information and belief, Leiden is a citizen of Illinois.

27.     Defendant William Daley ("Daley") served as a director of the Company from 2004 to 2011. Daley was a member of the Board's Public Policy Committee from 2004 to 2009. Upon information and belief, Daley is a citizen of Illinois.

28.     Defendant W. Ann Reynolds, Ph.D. ("Reynolds") served as a director of the Company from 1980 to 2010. Reynolds was a member of the Board's Public Policy Committee from 1999 to 2009, serving as its Chairman since 2003. Reynolds was also a member of the Board's Audit Committee from at least as early as 1997 to 2001, and a member of the Nominations and Governance Committee from at least as early as 1997 to 2000 and again from 2003 to 2009. Upon information and belief, Reynolds is a citizen of Florida.

29.     Defendant the Rt. Hon. Lord David Owen ("Owen") served as a director of the Company from 1996 to 2010. Owen was a member of the Board's Audit Committee and Nominations and Governance Committee from at least as early as 1997 to 2010. Upon information and belief, Owen is a citizen of the United Kingdom.

30.     Defendant Roy Roberts ("Roberts") served as a director of the Company from 1998 until 2011. Roberts was a member of the Board's Public Policy Committee from 1999 to 2011, serving as its Chairman in 2010, and was a member of the Board's Nominations and Governance Committee from 1998 to 2011. Upon information and belief, Roberts is a citizen of Michigan.

31.     Defendant William Smithburg ("Smithburg") served as a director of the Company from 1982 to 2011. Smithburg was a member of the Board's Public Policy Committee from 1999 to 2003, serving as its Chairman from 1999 to 2002, and was a member of the Board's

Audit Committee from 2002 to 2011. Upon information and belief, Smithburg is a citizen of Illinois.

32.     Defendant Boone Powell, Jr. ("Powell") served as a director of the Company from 1985 to 2008. Powell was a member of the Board's Public Policy Committee from 2004 to 2008, and was a member of the Board's Audit Committee from at least as early as 1997 to 2003. Upon information and belief, Powell is a citizen of Texas.

33.     Defendant Jack Greenberg ("Greenberg") served as a director of the Company from 2000 to 2007. Greenberg was a member of the Board's Audit Committee from 2003 to 2006, and was a member of the Board's Nominations and Governance Committee from 2001 to 2002. Upon information and belief, Greenberg is a citizen of Illinois.

34.     Defendant John Walter ("Walter") served as a director of the Company from 1990 to 2006. Walter was a member of the Board's Public Policy Committee from 2001 until 2005, and was a member of the Board's Audit Committee from at least as early as 1997 to 2005. Upon information and belief, Walter is a citizen of Florida.

35.     Defendant Addison Rand ("Rand") served as a director of the Company from 1992 to 2006. Rand was a member of the Board's Nominations and Governance Committee from at least as early as 1997 to 2004. Upon information and belief, Rand is a citizen of Connecticut.

36.     Defendant David Jones ("Jones") served as a director of the Company from 1982 to 2003. Jones was a member of the Board's Public Policy Committee from 1999 to 2002, a member of the Board's Audit Committee from at least as early as 1997 to 2001, and a member of the Board's Nominations and Governance Committee from at least as early as 1997 to 2002. Upon information and belief, Jones is a citizen of Kentucky.

37.     Defendants Leiden, Daley, Reynolds, Owen, Roberts, Smithburg, Powell, Greenberg, Walter, Rand, and Jones are collectively referred to as the "Former Director Defendants."

### E.     Senior Executives

38.     Defendant Thomas C. Freyman ("Freyman") serves as Executive Vice President, Finance and Chief Financial Officer ("CFO") of the Company.  He was appointed to his current role in 2004 and has served as Abbott's CFO since 2001.  Upon information and belief, Freyman is a citizen of Illinois.

39.     Defendant Richard A. Gonzalez ("Gonzalez") has served as Abbott's Executive Vice President, Pharmaceutical Products Group, since July 2010, after a brief retirement from the Company.  Gonzalez first joined Abbott in 1977 and held various senior management positions before retiring in 2007, including serving as Abbott's President and Chief Operating Officer. Gonzalez also served as a director of the Company from 2001 to 2007.  Upon information and belief, Gonzalez is a citizen of Florida.

40.     Defendant Mary Szela ("Szela") has served as Abbott's Senior Vice President, Global Strategic Marketing and Services, Pharmaceutical Products Group, since January 2010. Szela joined Abbott in 1987 and has held a series of leadership positions at Abbott, including Vice President, Commercial Pharmaceutical Operations, where she was responsible for sales and marketing of Abbott's pharmaceutical brands.  Szela also served as Senior Vice President, U.S. Pharmaceuticals, from 2008 to 2009.  Upon information and belief, Szela is a citizen of Illinois.

41.     Defendants Freyman, Gonzalez, and Szela are collectively referred to as the "Executive Defendants."

### F.     Former Senior Executives

42.     Defendant James Tyree ("Tyree") served as Abbott's Executive Vice President, Pharmaceutical Products Group, from 2007 to 2009.  Tyree also served as Abbott's Senior Vice President, Pharmaceutical Operations, from 2006 to 2007.  Upon information and belief, Tyree is a citizen of Illinois.

43.     Defendant William G. Dempsey ("Dempsey") is a former Abbott executive, having served in numerous senior leadership positions in the Pharmaceutical Products Division from 1982 to 2007.  Dempsey served as Abbott's Executive Vice President, Pharmaceutical Products Group, from 2006 to 2007.  Dempsey also served as Abbott's Senior Vice President, Pharmaceutical Operations, from 2003 to 2006.  Upon information and belief, Dempsey is a citizen of Illinois.

44.     Defendant Holger Liepmann ("Liepmann") served as Abbott's Executive Vice President, Pharmaceutical Products Group, in 2006.  Upon information and belief, Liepmann is a citizen of Nevada.

45.     Defendant John Landgraf ("Landgraf") served as Abbott's Senior Vice President, Pharmaceuticals, Manufacturing and Supply, from 2004 to 2010.  Upon information and belief, Landgraf is a citizen of Illinois.

46.     Defendant David Goffredo ("Goffredo") served as Abbott's Senior Vice President, Pharmaceutical Operations, from 2001 to 2002.  Upon information and belief, Goffredo is a citizen of Colorado.

47.     Defendant P. Loreen Mershimer ("Mershimer") served as Abbott's Vice President, Pharmaceutical Products, Integrated Healthcare Marketing and Policy, from 2001 to 2006.  Upon information and belief, Mershimer is a citizen of Illinois.

48.     Defendants Tyree, Dempsey, Liepmann, Landgraf, Goffredo, and Mershimer are collectively referred to as the "Former Executive Defendants."

* * *

49.     The Current Director Defendants, Former Director Defendants, Executive Defendants, and the Former Executive Defendants are collectively referred to as "Defendants."

## FACTUAL BACKGROUND

### A.     Abbott's Marketing Strategy

50.     Abbott is a global, broad-based health care company that focuses on the discovery, development, manufacture, and sale of a broad and diversified line of health care products in the United States and worldwide.  Abbott's products include HUMIRA®, TriCor®, Trilipix®, Simcor®, Niaspan®, Kaletra®, Aluvia™, Norvir®, Lupron®, Synagis®, AndroGel®, Ultane®, Sevorane®, Zemplar®, Synthroid®, Biaxin®, Klacid®, Klaricid®, and Creon®. These drugs contribute greatly to Abbott's bottom line.  For example, HUMIRA's worldwide sales were $6.5 billion in 2010, up from $5.5 billion in 2009, and $4.5 billion in 2008.  Until recently, Depakote had been one of Abbott's top selling drugs.  Notably, Depakote sales have dropped from $1.3 billion in 2008—the end of the Fraudulent Marketing Scheme—to $161 million in 2010.  As discussed below, Abbott's Depakote marketing practices throughout the Relevant Period were designed to systematically increase its market share in violation of federal regulations.  Once those marketing practices ceased in January 2009, Depakote sales plummeted.

B.     **Applicable Laws and Regulations Governing Abbott's Operations**

    1.     **FDA Regulation of Drug Marketing and Promotion**

        a.     **The FDA Regulates What Drugs May be Marketed, and the Uses for Which They May be Marketed**

51.     Abbott's drug business is subject to regulation and oversight by the FDA. Under the Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. §§ 301-97, new pharmaceutical drugs cannot be marketed or sold in the United States unless the sponsor of the drug demonstrates to the satisfaction of the FDA that the drug is safe and effective for each of its intended uses. 21 U.S.C. § 355(a), (d).

52.     To determine whether a drug is "safe and effective," the FDA relies on information provided by a drug's manufacturer; it does not, itself, conduct any substantial analyses or studies. Applications for FDA approval (known as New Drug Applications or "NDAs") must include "full reports of investigations which have been made to show whether or not such drug is safe for use and whether or not such drug is effective in use." 21 U.S.C. § 355(b)(1)(A).

53.     U.S. food and drug laws require that "adequate and well-controlled investigations" be used to demonstrate a drug's safety and effectiveness. *See* 21 U.S.C. § 355(d)(7). The FDA approves a drug if there are "adequate and well-controlled clinical trials" that demonstrate a drug's safety and effectiveness for its "intended conditions" of use. *See* 21 U.S.C. § 355(d)(5). The "intended conditions" for use of a drug are listed in the drug's labeling, which is reviewed and approved by the FDA. *See* 21 U.S.C. § 355(d)(1) & (2). Indications for use that are not listed in a drug's labeling have not been approved by the FDA. *See* 37 Fed. Reg. 16,503 (1972).

54.     The standards that govern the FDA safety and effectiveness requirements are contained in statutes, regulations, notices, and guidance documents.  The statutory requirement that a drug's effectiveness be demonstrated by "adequate and well-controlled clinical investigations" has been interpreted to mean a clinical study with (1) clear objectives; (2) adequate design to permit a valid comparison with a control group; (3) adequate selection of study subjects; (4) adequate measures to minimize bias; and (5) well defined and reliable methods of assessing subjects' responses to treatment.  *See* 21 C.F.R. § 314.26.

>           **b.      FDA Regulations Prohibit Off-Label Marketing and False and Misleading Statements About a Drug's Use**

55.     FDA regulations restrict how drug companies may market and promote approved drugs.  *See* 21 U.S.C. §§ 331, 352; 21 C.F.R. § 314.81.  Drug labels may not describe intended uses for the drug that have not been approved by the FDA.  21 U.S.C. §§ 331, 352.  Drug labels include all marketing and promotional materials relating to that drug.  *Id.*  Illegal "misbranding" can result in criminal penalties.  *See* 21 U.S.C. § 333.

56.     A manufacturer wishing to market or otherwise promote an approved drug for uses other than those listed on the approved label must resubmit the drug for a series of clinical trials similar to those required for the initial FDA approval.  *See* FDA Modernization Act of 1997 ("FDMA"), 21 U.S.C. §§ 360aaa(b), (c); *see also* 21 C.F.R § 314.54; 21 U.S.C. §§ 301, *et seq.*  A supplemental NDA must be filed.  Unless and until an additional indication is approved by the FDA, the unapproved use is considered to be "off-label."

57.     "Off-label" refers to the use of an approved drug for any purpose, or in any manner, other than what is described in the drug's labeling.  Off-label use includes treating a condition at a different dose or frequency than specified on the label, or treating a different patient population.

58.     Although the FDA is responsible for ensuring that a drug is safe and effective for the specific approved indication, the FDA does not regulate the practice of medicine.  Once a drug is approved for a particular use, the FDA does not prohibit physicians from prescribing the drug for uses that are different than those approved by the FDA.  Thus, off-label information may be disseminated to a healthcare practitioner, ***but only in response to an "unsolicited request" from the practitioner***.  21 U.S.C. § 360aaa-6.

59.     Absent an unsolicited request from a physician, federal laws prohibit any advertising that recommends or suggests an off-label use for an approved drug.  The FDA has interpreted "advertising" to include a significant amount of speech that would not typically be considered advertising.  *See Final Guidance on Industry-Supported Scientific and Educational Activities*, 62 Fed. Reg. 64,074 (Dec. 3, 1997).  Specifically, any manufacturer speech explaining one of its products is an "advertisement" for the product and is subject to the prohibitions against off-label marketing contained in 21 C.F.R. § 202.1.

## 2.     Prescription Drug Reimbursement Under Medicaid and Other Federal Health Care Programs

60.     Medicaid is a public assistance program providing for payment of medical expenses for the poor and disabled.  Funding for Medicaid is shared between the federal government and state governments.  The Medicaid program subsidizes the purchase of more prescription drugs than any other program in the United States.

61.     Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines.  The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation.  42 U.S.C. §§ 1396, *et seq.*

62.     Federal reimbursement for prescription drugs under the Medicaid program is available for "covered outpatient drugs."  42 U.S.C. §§ 1396b(I)(10), 1396r-8(k)(2), (3). Covered outpatient drugs are drugs that are used for "a medically accepted indication."  *Id.* at § 1396r8(k)(3).

63.     A medically accepted indication, in turn, is a use which is listed in the labeling approved by the FDA, or that is included in one of the drug compendia identified in the Medicaid statute.  *Id.* at § 1396r-8(k)(6).

64.     As set forth in detail herein, the off-label uses of the Depakote Products promoted by Defendants were not eligible for reimbursement from Medicaid because the drugs' off-label uses were neither listed in the labeling approved by the FDA nor included in the drug compendia specified by the Medicaid statute.

### 3.     The Anti-Kickback Statute

65.     The federal health care Anti-Kickback statute, 42 U.S.C. § 132a-7b(b), prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made under a federally-funded health care program.

66.     Thus, drug companies may not offer or pay any remuneration, directly or indirectly, to induce physicians or others to order or recommend drugs that may be paid for by a federal health care program.

67.     Violation of the Anti-Kickback statute subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation.  42 U.S.C. §§ 1320a-7(b)(7), 1320a(a)(7).

C. **Abbott's Illicit Marketing Practices Have Been the Target of Multiple Investigations**

1. **An Abbott Subsidiary Gets Investigated, and Settles With the U.S. Government for Defrauding Medicare and Medicaid**

68. TAP Pharmaceutical Products Inc. was a joint venture of Abbott and Japan's Takeda Pharmaceuticals Company Ltd. Twenty percent of Abbott's revenues were derived from TAP, and Abbott appointed some of the members of TAP's board of directors. Abbott and TAP worked together in sales and in marketing certain products.

69. In 1996, Douglas Durand, the former vice president of TAP, filed a *qui tam* lawsuit under the False Claim Act. Among other things alleged in his complaint, Durand asserted that he had discovered that TAP had implemented a marketing plan to increase the market share of Lupron, a prostate cancer drug that generated approximately $800 million a year in sales for TAP. As part of this scheme, doctors were given gifts and kickbacks based on the amount of Lupron they purchased and prescribed. Additionally, the doctors received free samples of Lupron in exchange for billing Medicare and other insurers the full price for those samples.

70. The Lupron scheme Durand described is better known as "marketing the spread," which involves the manufacturers' practice of inflating the Average Wholesale Price ("AWP") used by Medicare and other federal programs as the basis for reimbursement of the drug, while deeply discounting the price paid by physicians (or giving the drug to physicians for free). The physician would then profit from the "spread" between the artificially inflated rate and the actual acquisition cost of the drug. Because in setting reimbursement rates Medicare and state Medicaid programs would use the AWPs generated by the pharmaceutical industry, Medicare and Medicaid fraud could be perpetrated through pharmaceutical manufacturers such as Abbott

purposefully manipulating the AWP, which would increase the Company and its customers' profits by increasing the amount the federal health care programs reimburse its customers.

71.     Durand also alleged that the doctors were incentivized to prescribe Lupron instead of other cheaper, similarly effective drugs, such as Zoladex, which was manufactured by one of TAP's and Abbott's competitors, AstraZeneca.

72.     Public documents indicate that the materials Durand provided to the Government included a letter dated October 13, 1995 from William C. Lucas, on behalf of a TAP competitor, sent to a senior attorney at Abbott, and evidence that the attorney forwarded the letter to the director of regulatory affairs at TAP.

73.     The letter explained that a TAP representative had made a proposal to a doctor in Ohio that if the doctor bought a month of Lupron for his patients, TAP would supply three months of Lupron for free.

74.     The Government ultimately conducted an undercover operation to investigate the illegal kickback scheme involving TAP and Abbott (the "TAP Investigation").

75.     On April 20, 2001, Abbott announced that it would restate its first quarter earnings to include a $344 million charge in connection with "recent developments related to the U.S. Department of Justice investigation into the marketing and sales practices" regarding TAP and Lupron.

76.     On October 3, 2001, the DOJ announced that TAP pled guilty to the federal charge of conspiracy and paid $875 million in fines and penalties.  This massive amount consisted of a $290 million criminal fine, which was at the time the largest criminal fine ever in a healthcare fraud prosecution, a payment of $559.5 million for filing false and fraudulent claims with the Medicare and Medicaid programs as a result of TAP's fraudulent drug pricing schemes

and sales and marketing misconduct, and a payment of nearly $25.5 million to the states for similar fraudulent conduct and for its failure to provide the state Medicaid programs TAP's best price for those drugs as required by law. Abbott received immunity for its cooperation in the federal investigation.

77.     As part of the settlement, TAP also entered into a Corporate Integrity Agreement, which bound its officers and directors (and others) (the "TAP Covered Persons") to certain requirements (the "TAP CIA"). These terms included the imposition of requirements as to how TAP supervised its marketing and sales staff and how TAP reported to the Medicare and Medicaid programs the true average sale price for drugs reimbursed by those programs. In relevant part, the CIA also required TAP to maintain a Compliance Committee, which would report regularly to the board of directors of TAP on matters related to compliance with the CIA and with federal health care program requirements. The CIA also mandated training to all current and future TAP Covered Persons for the duration of the CIA—seven years (2008). This annual training was supposed to explain, among other things, the CIA requirements, the TAP Compliance program, and examples of proper and improper promotion, marketing, and sales practices.

78.     Among others, the TAP Covered Persons include former Abbott board member and Defendant Leiden.

### 2.     As the TAP Investigation and Settlement Were Coming to a Close, the Government Turned its Sights to Abbott

79.     Less than two months before the TAP settlement was announced, on August 23, 2001, the *Chicago Tribune* reported that another division of Abbott, the Ross Products Division, was being investigated for a different kickback scheme ("Ross Investigation"). This scheme involved potential Medicare and Medicaid fraud related to enteral feeding equipment being

supplied to nursing homes and other providers caring for seriously ill people. The feeding equipment included enteral products and enteral nutritional products. Enteral products are healthcare products intended to assist patients who, because of disease or other disorder, are not able to ingest meals in a normal manner. Enteral nutritional products introduce nutrition into the stomach and digestive system of such patients.

80.     As part of the Government's undercover investigation, dubbed "Operation Headwaters," federal agents created a fictitious medical supplier known as Southern Medical Distributors. During its operation, various manufacturers, including Ross, offered kickbacks to undercover agents to entice them to purchase the manufacturers' products and then advised them how to fraudulently bill the Government for those items.

81.     On June 26, 2003, Abbott announced that it planned to pay $622 million in connection with the settlement of the Ross Investigation, a fine that was expected to result in a one-time charge of $0.34 per share.

82.     A month later, on July 23, 2003, Abbott settled the Ross Investigation, incurring charges of approximately $614.5 million. As part of the settlement, Abbott agreed to pay approximately $364.8 million in damages and penalties to federal Medicare and Medicaid, and approximately $50 million to Medicaid programs of the 50 states and the District of Columbia. C.G. Nutritionals, a division of Ross, paid a $200 million fine and pled guilty to a federal charge of Obstruction of a Criminal Investigation of Health Care Offenses, which was entered on October 27, 2003.

83.     As part of the settlement, Abbott also entered into a CIA with the OIG of the HHS, which, among other things, required Abbott to reform the sales and marketing practices of its enteral feeding operations (the "Abbott CIA"). The Abbott CIA bound the current and future

Abbott Board (among others) (the "Abbott Covered Persons") to its terms. Similar to the TAP

CIA, the Abbott CIA required the Abbott Covered Persons to engage in annual training and

education regarding compliance with all federal healthcare program requirements, including the

federal anti-kickback statute, and on proper and improper promotion, marketing, and sales

practices. New Abbott Covered Persons (including new Board members) were supposed to

receive this training and education within 30 days of their employment.

84.     The Abbott CIA bound Abbott's then-current and future directors to its terms for

the duration of the agreement—five years (2008). The Abbott Covered Persons include

Defendants White, Fuller, Austin, Leiden, Reynolds, Owen, Roberts, Smithburg, Powell,

Greenberg, Walter, and Rand, who were on the Abbott Board at the time the Abbott CIA was

executed, and Defendants Farrell, Scott, Tilton, Osborn, and Alpern, who joined the Abbott

Board while the Abbott CIA was in effect.

### 3.     Shareholder Derivative Suits Arise From the Settlements of the 2001 TAP Investigation and the 2003 Ross Investigation

85.     In October 2001, following the settlement of the TAP Investigation, Abbott

shareholders brought derivative litigation against the Board alleging, among other things, that

Abbott's Board members breached their fiduciary duties by failing to take action to prevent

improper marketing and pricing practices at TAP (the "TAP Derivative Litigation").

86.     Likewise, beginning in June 2003, other Abbott shareholders filed derivative

lawsuits against the Board in connection with the settlement of the Ross Investigation (the "Ross

Derivative Litigation"). These lawsuits also alleged that the Board members breached their

fiduciary duties in failing to stop the alleged improper business practices in the enteral nutritional

business.

87.     On January 5, 2005, the parties agreed to a Stipulation and Agreement of Settlement of the litigation involving the breaches alleged in the TAP Derivative Litigation. The then-current Board, which included Defendants White, Fuller, and Austin, Leiden, Daley, Reynolds, Owen, Roberts, Smithburg, Powell, Greenberg, Walter, and Rand, approved the terms of the settlement.

88.     In conjunction with the settlement of the TAP Derivative Litigation, the Board agreed that the charter of the Public Policy Committee would be amended to expressly address healthcare compliance issues.

89.     The next day, on January 5, 2005, the parties agreed to a Stipulation and Agreement of Settlement of the litigation involving the breaches arising out of the Ross Derivative Litigation.

90.     Upon information and belief, the terms of the settlement of the Ross Derivative Litigation created similar revisions to the charter of the Public Policy Committee as those created by the settlement of the TAP Derivative Litigation.

### 4.     Abbott Settles a Third Derivative Litigation Arising From the Company's Illegal Conduct

91.     Not coincidentally, the charter of the Public Policy Committee had only been revised a scant two months earlier, in conjunction with the settlement of a third derivative action involving Abbott. That litigation arose from a 1999 Consent Decree of Permanent Injunction against Abbott, Miles White (Abbott's CEO and Chairman), and Thomas D. Brown (then President of Abbott's Diagnostics Division) (the "1999 Consent Decree").

92.     As part of the 1999 Consent Decree, Abbott was required to pay a then-record $100 million civil fine to the FDA, withdraw 125 types of medical diagnostic test kits from the

U.S. market, destroy certain inventory, and make a number of corrective changes in its

manufacturing procedures after six years of federal violations.

93.     Several Abbott shareholders brought derivative actions against the Board in

connection with the regulatory failures that led to the 1999 Consent Decree and the resulting

injury to the Company (the "Consent Decree Derivative Litigation").  After five years of

litigation, the parties reached a settlement agreement in December 2004, which was subsequently

approved by the court.  The broader implications of this settlement are discussed below.

### D.     Fiduciary Duties of Abbott's Management and Board

94.     Defendants have fiduciary duties to the Company and its shareholders, including

the duties of loyalty, good faith, and candor.  In addition, Abbott's foundational corporate

documents also detail the requirements of the Board's duties, requiring, *inter alia*, that the Board

must actively identify and report any illegal and/or unethical business practices within the

Company.

95.     Pursuant to Abbott's Governance Guidelines, "[t]he board of directors shall

review and, where appropriate, approve fundamental operating, financial, risk management and

other corporate strategies, as well as major plans and objectives and shall monitor the

effectiveness of management policies and decisions, including the execution of strategies."

Moreover, the Governance Guidelines require the Abbott Board to "comply with all laws, rules

and regulations applicable to their capacity as directors of Abbott," and to "report violations of

laws, rules, regulations or the Code of Business Conduct to the Chairman of the Board and Chief

Executive Officer, the Vice President and Chief Ethics and Compliance Officer, or any other

appropriate Abbott personnel."

96.     In order to ensure that the Board remains fully informed at all times, the

Governance Guidelines state that "[e]ach director shall have complete access to Abbott's

23

management.  Abbott's management will make itself available to answer the directors' questions about Abbott between meetings."

97.     In addition to the Governance Guidelines, Abbott maintains a Code of Business Conduct (the "Code"), which applies to all Defendants.  The Code enumerates several "Principles" premised on Abbott's "core values of honesty, fairness and integrity."  For example, the Code provides:

### Principle 1: Fair Dealing

We will deal honestly and ethically with Abbott and with Abbott's customers, suppliers, competitors, employees and other stakeholders.

We will treat people fairly.  We must not take unfair advantage of anyone through manipulation, concealment, abuse of privileged or otherwise undisclosed information, misrepresentation of material facts or any other unfair-dealing practices.

### Principle 2: Avoiding Conflicts of Interest

A conflict situation can arise when one of us takes action or has interests that may make it difficult to perform our Abbott work objectively and effectively.

We must avoid any investment, interest, or association that interferes or might interfere with the independent exercise of our own individual best judgment, and with our obligation to perform our responsibilities in the best interests of Abbott.

For example:

* * *

(2) We will not accept from or give to any supplier, customer, or competitor any gift or entertainment except as allowed under [Abbott's "Gifts, Meals and Entertainment" Policy].

* * *

### Principle 5: Accuracy and Integrity of Books, Records and Accounts

\* \* \*

No transaction or arrangement shall be structured to circumvent Abbott's internal control system.

No false or artificial entries shall be made for any purpose.

\* \* \*

**Principle 7: Full, Fair, Accurate, Timely and Understandable Disclosures**

We will ensure that Abbott's public disclosures comply with all applicable securities laws, including all applicable financial reporting and accounting regulations. Strict compliance with Corporate and Divisional accounting policies and procedures is required, as is full cooperation with internal and external auditors.

**Principle 8: Compliance With Laws**

We are required to familiarize ourselves with all the laws, rules and regulations that apply in the areas within the scope of our work responsibilities, including, as applicable, the following areas. Contact the Legal Division for advice in any area where you have questions.

**Food and Drug Laws**

We must comply with all applicable laws, rules, regulations, consent decrees and other orders of the United States Food and Drug Administration and any other similar governmental authorities in other countries where Abbott does business governing research, development, manufacture, distribution and promotion of foods, drugs, medical devices, diagnostic products, nutritional products or biological products.

\* \* \*

**Laws Relating to Government Health Care Programs**

We must comply with the laws relating to government health care programs in each country where Abbott does business.

In the United States, its territories and possessions, and Puerto Rico, many Abbott products are reimbursed or purchased by

25

Federal Health Care Programs – programs that include Medicare, Medicaid, Department of Defense and Department of Veterans Affairs health care programs, and many other Federal or Federally-funded programs that pay for health care items and services. These programs are regulated through a variety of laws affecting the coverage and reimbursement of Abbott products, as well as the sale and marketing of those products.

Abbott is committed to full compliance with all Federal Health Care Program requirements, including the following:

**Federal Anti-kickback Statute**

The laws that regulate these programs include the Federal anti-kickback statute, which applies both to our sales and marketing activities and to a broad range of other activities, including grants, research contracts, and consulting agreements. It generally prohibits offering or paying (or soliciting or receiving) cash or other benefits to induce the purchase, order, or recommendation of products eligible for payment by a Federal Health Care Program.

[T]o ensure Abbott's compliance with the anti-kickback statute, we must carefully evaluate and properly structure any arrangements with parties in a position to prescribe, purchase or recommend Government-reimbursed products (for example, physicians, hospitals, nursing facilities, HMOs, PBMs, GPOs, or pharmacies), and must always avoid any arrangements that could inappropriately influence treatment or purchasing decisions.

**False Claims Laws**

The civil False Claims Act and other statutes prohibit knowingly or recklessly submitting false claims to the Government, or causing others to submit false claims. Accordingly, we must exercise care to ensure that we do not submit any inaccurate or otherwise improper claims for payment to the Government, or cause others to do so. Abbott contracts with Government customers and must avoid submitting any claims for payments not properly due. While Abbott does not itself submit claims to insurance programs like Medicare and Medicaid, many of our customers do. We must avoid any conduct that could lead customers to submit false claims by following procedures carefully designed to ensure that any information we provide to customers about Medicare or

26

Medicaid reimbursement for our products is accurate and otherwise proper.

* * *

**Civil Monetary Penalties Law**

This law authorizes the imposition of civil monetary penalties for a variety of conduct. . . .

Failure to adhere to Federal Health Care Program requirements, or to related Abbott standards, policies and procedures, can have a number of serious consequences, both for Abbott and for the individuals involved. . . . ***[V]iolation of these laws may result in exclusion of Abbott or individual employees from participation in Federal Health Care Programs.*** (emphasis added).

98. The Board has several committees to monitor specific aspects of Abbott's business. These committees have their own supplemental charters setting forth additional express duties for their respective members. For example, the charter of the Audit Committee provides that its members "shall assist the Board in fulfilling its oversight responsibility with respect to . . . legal and regulatory compliance as it relates to financial matters, including accounting, auditing, financial reporting, and securities law issues . . . ; and Abbott's enterprise risk management, including major financial risk exposures . . . ." In addition, the charter permits the Audit Committee, "to the extent it deems necessary or appropriate, conduct or authorize investigations into any matter within the scope of its authority and may retain legal counsel, accountants and others to assist it in the conduct of its responsibilities, including investigations."

99. Abbott's Nominations and Governance Committee is expressly charged with ensuring that the members of the Board and the Company's senior executive officers are complying with their fiduciary duties, Governance Guidelines, and Code, described above. In this regard, the members of the Nominations and Governance Committee must "[o]versee the annual evaluation of the performance of the Board, and members of management of Abbott,"

"annually recommend to the Board the nominees for election as directors," and "[r]ecommend to the Board the persons to be elected as the executive officers of Abbott." The Nominations and Governance Committee must also "[r]eview annually the qualifications, requirements, membership, structure and performance of committees of the Board, including the Nominations and Governance Committee, and make recommendations to the Board regarding committee memberships and chairmanship and other matters, as appropriate . . . ." Moreover, the Nominations and Governance Committee is required to "[r]eview and assess the adequacy of Abbott's corporate governance guidelines and recommend amendments to the Board . . . ."

100. Abbott's Public Policy Committee is tasked with assisting the Board in fulfilling its oversight responsibility. The charter of the Public Policy Committee provides, in relevant part:

> 1. *Purpose*. The Public Policy Committee of the Board of Directors shall assist the Board in fulfilling its oversight responsibility with respect to: public policy, regulatory (including regulation by the Federal Food and Drug Administration, as well as other domestic, foreign and international regulatory bodies) and government affairs and healthcare compliance issues that affect Abbott . . . , by discharging the responsibilities set forth below.
>
> \* \* \*
>
> 3. *Authority and Responsibilities*. To assist it in the conduct of its responsibilities, the Public Policy Committee shall consult with management and, to the extent it deems it necessary or appropriate, may seek advice and assistance from Abbott employees or others, and may retain legal counsel and other advisors.
>
> The Public Policy Committee shall report to the Board on a regular basis.
>
> \* \* \*
>
> The Committee shall:

• Review and evaluate Abbott's policies and practices with respect to maintaining legal, regulatory and healthcare compliance . . ., and review them with the Board as appropriate.

• Devise a process for the dissemination of information to the Committee from management with respect to regulatory and healthcare compliance matters, including, as appropriate, presentations to the Committee from management concerning the state of regulatory compliance and all issues with respect thereto.

• The Chief Ethics and Compliance Officer shall report to the Public Policy Committee on an as needed basis on any significant compliance issues.

101. Defendants' gross misconduct is wholly inconsistent with the Company's internal policies and fiduciary duties by which all Defendants agreed to be bound as a condition to accepting their positions with the Company.

**E.** **Abbott Board Duties and Policies Created From the Various Derivative Litigation Settlements**

102. As noted above, Abbott's Board became subject to various requirements to protect against misconduct relating to Medicare and Medicaid fraud, and to ensure compliance with all Federal health care program requirements as part of the Abbott CIA. The Board was also subject to additional requirements created through the settlements of the Consent Decree Derivative Litigation, the TAP Derivative Litigation, and the Ross Derivative Litigation.

**1.** **The Abbott CIA (imposed in 2003)**

103. The Abbott CIA was executed on or about July 22, 2003 by two Abbott lawyers on behalf of the Company. In the preamble, Abbott represented that it had already initiated voluntary compliance measures, including "regular training to Covered Persons concerning Abbott's Code of Business Conduct" (where Covered Persons included Abbott's current and future directors) and "review and disciplinary procedures aimed, in part, at ensuring that Abbott's activities are in compliance with all Federal health care program requirements."

29

104.    The Abbott CIA required Abbott to direct its Chief Compliance Officer to develop and implement written "policies, procedures, and practices designed to ensure compliance with the requirements set forth in this CIA and with Federal health care program requirements."  Additionally, Abbott was directed to revise and redistribute its Code of Business Conduct, which was required to set forth, in relevant part, "Abbott's commitment to full compliance with all Federal health care program requirements, including the federal anti-kickback statute"; "Abbott's requirement that all of its Covered Persons shall be expected to comply with all Federal health care program requirements"; and, "the requirement that all of Abbott's Covered Persons shall be expected to report to the Chief Compliance Officer or other appropriate individual designated by Abbott suspected violations of any Federal health care program or of Abbott's own Policies and Procedures."

105.    The Abbott CIA also required the Company to create an internal mechanism for directly reporting compliance violations to the Board and required active involvement by the Board in policing Abbott's compliance with the FDCA and the federal anti-kickback statute.  For example, the Abbott CIA specifically required the Chief Compliance Officer to "make periodic (or at least semi-annual) reports regarding compliance matters directly to the Board of Directors of Abbott, or its designated subcommittee, in such form or manner as the Board of Directors of Abbott determines, and shall be authorized to report on such matters to the Board of Directors at any time."

106.    Additionally, the Abbott CIA called for each Board member to receive annual training regarding the CIA, Abbott's Compliance Program, and specific training regarding (in addition to, among other things, proper methods of promoting, marketing, and selling enteral nutrition items and services for which Federal health care program reimbursement may be made,

in accordance with all applicable statutes, regulations, and requirements, including but not limited to, the federal anti-kickback statute) "examples of proper and improper promotion, marketing, and sales practices." All of the Director Defendants who were members of the Board during the pendency of the Abbott CIA received this training and thereby would have been aware of all compliance matters, including those involving the Depakote Products, as described more fully below.

### 2. Modifications to the Public Policy Committee Charter (2004 and 2005)

107. In addition to the CIA, Defendants were subject to additional notice requirements of compliance issues and problems as a result of various derivative litigation brought by Abbott shareholders. The settlements of those actions created additional systems designed to inform the Board of problems with the Company's compliance with Federal healthcare regulations and programs, such as those involving the Depakote Products.

108. First, the Board modified the charter of its Public Policy Committee as part of the settlement of the Consent Decree Derivative Litigation. This charter establishes conclusively that its purpose was to ensure that the Board exercised proper oversight of federal regulatory compliance at Abbott. According to the memorandum filed by plaintiffs in support of final approval of the settlement, one of the critical needs at Abbott was the "improved flow of information between Abbott management and the Board of Directors, in the field of regulatory compliance." The Charter of the Public Policy Committee was fashioned to accomplish this goal, along with funds made available by Abbott to achieve improved regulatory and compliance activities. Additionally, "[t]he ultimate goal was for Abbott to remain in regulatory compliance, and if not, its Board of Directors will be aware and able to react to any non-compliant activities."

109.    According to the papers filed in conjunction with the settlement, discovery in

that case revealed that "no clear mechanism existed in Abbott to provide the Board with

information concerning regulatory issues on a timely basis."  The Public Policy Committee was

supposed to fix this serious corporate governance problem and lessen the chances and severity of

costly regulatory non-compliance.

110.    The modified purpose of the Public Policy Committee was set forth in its charter,

as follows:

> The Public Policy Committee of the Board of Directors shall assist
> the Board in fulfilling its oversight responsibility with respect to:
> public policy, regulatory (including regulation by the Federal Food
> and Drug Administration, as well as other domestic, foreign and
> international regulatory bodies) and government affairs issues that
> affect Abbott (recognizing that other board committees assist the
> Board of Directors in reviewing certain areas of legal and
> regulatory compliance) . . . .

111.    Second, as noted above, as part of the settlement of the TAP Derivative

Litigation, the purpose of the Public Policy Committee was amended to specifically include

oversight responsibility with respect to healthcare compliance issues.  In conjunction with the

settlement of the TAP Derivative Litigation, the Board agreed that the Charter of the Public

Policy Committee would be amended to expressly address healthcare compliance issues by

providing that: (1) the Public Policy Committee shall assist the Board in fulfilling its oversight

responsibility with respect to healthcare compliance issues that affect Abbott; (2) the Public

Policy Committee shall review and evaluate Abbott's policies and practices with respect to

healthcare compliance and review them with the Board as appropriate; and (3) the Public Policy

Committee shall devise a process for the dissemination of information to the Committee from

management with respect to healthcare compliance matters.  The current charter and its

provisions are discussed *supra*, ¶110.

32

112.     Thus, between (1) the Abbott CIA imposing requirements for Defendants to be regularly trained and updated on any illegal activity involving, among other things, Medicare and Medicaid Fraud and illegal kickbacks, and (2) the Public Policy Committee creating mechanisms for management to report illegal activity and violations of healthcare compliance rules and regulations to Defendants, Defendants knew or should have known about any possible healthcare compliance issues regarding the Depakote Products.  As it turns out, they utterly failed in exercising their fiduciary duties.

> **F.     Abbott Illegally Promotes Off-Label Uses of Depakote, Causing the Company to Reserve $1.5 Billion in Anticipation of Settling the Government Investigation**
>
> **1.     The Criminal Promotion of Depakote**

113.     The Government Investigation, as alleged in the Government's complaint, and as detailed in the other whistleblower complaints, establishes that Defendants were breaching their fiduciary duties with respect to the marketing of Depakote long before the various derivative lawsuits settled, and long after the charter of the Public Policy Committee was amended to catch and prevent such misconduct from occurring.

114.     The Government complaint details Abbott's marketing and promotion of the Depakote Products.  Such products are generally included in the group of anti-epileptic drugs ("AEDs"), which are a diverse group of pharmaceuticals used in the treatment of patients with epilepsy.  AEDs are also used in the treatment of bipolar disorder.[1]

115.     The Depakote Products include: (i) Depakote (divalproex sodium), which was first approved for marketing by the FDA on March 10, 1983 for the treatment of epilepsy; (ii) Depakote Sprinkles, the capsule form of Depakote, which was approved by the FDA on

---

[1] Complaint at ¶¶72, 74, *United States of America ex. rel. Thomas J. Spetter, Jr. v. Abbott Labs.*, Civ. No. 1:10cv6 (J. Wilson) (D. W.Va. Feb. 4, 2011).

September 12, 1989 for the treatment of epilepsy in children; (iii) Depacon, the intravenous form

of Depakote, which was approved by the FDA on December 30, 1996 for the treatment of

various types of seizures; (iv) Depakene, the liquid form of Depakote, which was approved by

the FDA on February 28, 1978 for the treatment of various forms of seizures; and (v) Depakote

ER, an extended release divalproex sodium formulation, which was approved by the FDA for the

treatment of migraines on August 4, 2000, for the treatment of epilepsy on August 14, 2003, and

for the treatment of bipolar disorder on December 6, 2005.[2]

116.     Despite the extremely limited FDA-approved uses of the Depakote Products, the

Government complaint shows that Abbott promoted the Depakote Products off-label for the

treatment of numerous ailments, including:

a)       For the adjunctive treatment of schizophrenia;

b)       To treat aggression in adults and children who were considered mentally

retarded or developmentally disabled, despite the fact that the FDA has never approved the

Depakote Products to treat aggression in any patient population;

c)       For the management and treatment of substance abuse in bipolar disorder;

d)       For the treatment of post-traumatic stress disorder and intermittent

explosive disorder;

e)       To treat psychiatric conditions in children and adolescents;

f)       To treat borderline personality disorder;

g)       For the treatment of bipolar depression;

h)       For the treatment of "signs of mania"; and

---

[2] *Id.* at ¶¶75-78.

i)     For the treatment of symptoms for which only Depakote had received FDA approval to treat.[3]

117.     Abbott's above-described misrepresentations leave no doubt as to its blatant disregard for patient safety.  The most appalling aspect of the Fraudulent Marketing Scheme, however, was the scheme's primary target: the elderly.

118.     The Depakote Products had been (and continue to be) heavily used for the treatment of Medicaid, Medicare Part D, Veterans Affairs, and Federal Employees Health Benefits recipients, particularly for treatment of the elderly.  Indeed, Depakote's and Depakote Sprinkles' reimbursements from Medicaid alone from 1991 through 2008 totaled approximately $5.5 billion.  In addition, Medicaid's expenditures for Depakote ER from 2000 to 2008 were $2.1 billion.  Given that most residents of LTC facilities are age 65 and older, Abbott aimed its illegal and deceptive marketing efforts at these facilities.[4]

### a.     Abbott Creates the LTC Group

119.     Abbott formed the LTC Sales Force in January 1998 to market the Depakote Products.  Until this time, Abbott's sales representatives had sold the Depakote Products primarily to physicians treating epilepsy and bipolar patients.  Abbott's purpose in creating the LTC Sales Force, however, was to maximize off-label sales for agitation and aggression associated with the treatment of dementia.  Notably, although Abbott had planned to attempt to obtain approval from the FDA to market the Depakote Products for these indications, ***the Company decided not to follow through due to concerns that the drugs caused unacceptable side effects.***  Nevertheless, the initial group of thirty LTC sales representatives, referred to as the

---

[3] *Id.* at ¶¶297-360.

[4] *Id.* at ¶¶79, 86.

"Charter Members" of the LTC Sales Force, were directed by Abbott's management to sell the Depakote Products for treatment of dementia.[5]

120.    The Charter Members attended training courses conducted by the Company's sales trainers in Abbott Park, Illinois, at which they were provided with materials outlining the market for sales of the Depakote Products, including the fact that the majority of LTC patients' pharmacy benefits would be reimbursed by Government programs—in particular, Medicaid. During their training, the Charter Members were initially told to promote the Depakote Products only on-label, but were later taken into a different meeting room where the door was closed and they were given a presentation by Larry Winfield.  According to the Government's complaint, Mr. Winfield, an experienced Abbott neuroscience sales representative who had been selling the Depakote Products for several years, instructed the Charter Members that they were to ignore Abbott's trainers instructions to only sell the Depakote Products on-label, and that their primary sales opportunities would be off-label sales in the LTC market for agitation and aggression in the treatment of dementia.[6]

121.    In order to influence LTC decision-makers to use the Depakote Products, Abbott's management trained its LTC Sales Force to offer the following "enhancements [that] are used to win favorable contracts with providers":

a)      Up-front discounts through a charge-back system to minimize customer outlays and avoid rebate calculations;

b)      Rebate contracts based on market share performance;

c)      Bundled product details in connection with programs implemented to affect market share performance favorably for a particular product or products;

---

[5] *Id.* at ¶¶112-14.
[6] *Id.* at ¶¶114-15.

   d)  Extended dating, which allowed pharmacy providers to improve cash flow by deferring payments;

   e)  Price protection; and

   f)  Availability of specialized packaging intended for the LTC market.[7]

  122.  Abbott also instructed its LTC sales representatives to provide a number of other kickbacks, unrelated to drug contracting, to "influence pharmaceutical market share in the nursing facility through control over physician prescribing habits and access to nursing facility patients" by providing "value-added" programs, including:

   a)  Regional/local educational symposia for physicians and nurses;

   b)  Nursing in-service programs;

   c)  Market research;

   d)  Clinical research;

   e)  New product information;

   f)  Advisory boards; and

   g)  Support for clinical programs.[8]

  123.  By 2001, the LTC Sales Force had grown from its original 30 Charter Members to 60 LTC sales representatives, and by 2003, it was composed of more than 100 sales representatives.  This growth in Abbott's LTC Sales Force was accompanied by a corresponding spike in off-label sales of the Depakote Products.[9]

  124.  In 2004, Abbott merged the LTC group into its hospital group and named the combined group its Special Account Executive Institutional Sales Group.  This formality had no

---

 [7] *Id.* at ¶116.
 [8] *Id.* at ¶117.
 [9] *Id.* at ¶120.

effect on the LTC group's function, as Abbott continued to illegally promote off-label use of the Depakote Products in LTC facilities throughout the United States.[10]

125.     By this point in time, the revised charter of the Public Policy Committee had been enacted for at least six months, and according to the Company's proxy statement filed in March 2005, the Public Policy Committee had met two times.  The members of the Public Policy Committee at that time consisted of Defendants Austin, Daley, Reynolds, Roberts, and Rand.

126.     Thus, for any such off-label marketing during the Relevant Period, Defendants either purposely violated the Company's internal polices and controls, or entirely failed to implement such policies and controls.

### b.     Abbott's Management Trains its Sales Force to Manipulate Healthcare Professionals

127.     According to the Government's complaint, the doctors to whom Abbott promoted the Depakote Products reasonably believed that the information provided to them by the LTC Sales Force and endorsed at Abbott-sponsored speaker programs and Continuing Medical Education ("CME") events was truthful.  Unfortunately, these doctors' reliance on Abbott's integrity was misplaced.  Abbott went to great lengths to exploit physicians' trust, and did so with the specific intent to influence physicians to write more prescriptions for the Depakote Products, including for numerous off-label uses.  Abbott's management instructed the Company's sales representatives to provide healthcare professionals with Abbott-approved materials, including "approved" clinical studies, industry supplements, and CME materials. These off-label materials were provided to healthcare professionals at one-on-one details, in-

---

[10] *Id.* at ¶121.

services, speaker programs (both CME and non-CME), advisory boards, conferences, dinners, sporting events, and cultural events.[11]

128.    Abbott's management trained its LTC Sales Force to "leverage" clinical information concerning uses of the Depakote Products when planning each sales call.  Sales representatives were to pinpoint a study's key findings (including off-label findings), which were then turned into "key selling messages."  In the event that a study contained negative information concerning the Depakote Products, representatives were instructed to manipulate the message by "[s]often[ing] the language around an unfavorable point and focus[ing] on what the strengths [were]" in order to make their message more compelling.  Representatives were told that they were "selling the validity of [their] study and the product at the same time."[12]

129.    LTC Sales Force representatives were supplied with laptop computers to enter "call notes," describing what they did on a particular sales call.  These call notes were regularly uploaded to Abbott's mainframe computers and were therefore available for each Abbott district manager, as well as its Sales and Marketing management, who tracked the success of off-label sales calls.  In addition, district managers regularly conducted "ride-alongs" with each of their respective sales representatives, in order to ensure that representatives were promoting the off-label message, as well as to "coach" them on how to improve that message.

130.    Simultaneously with the creation of the LTC Sales Force, Abbott's management instituted quota and bonus programs designed to motivate the sales representatives to sell to doctors who could not treat their patients using the Depakote Products on-label.  The quota system required the LTC Sales Force to detail *any* physician on their call lists, regardless of specialty, and awarded the Sales Force members with bonuses based on sales of the Depakote

---

[11] *Id.* at ¶¶105, 107.
[12] *Id.* at ¶108.

Products.  These physicians included doctors who would not normally treat patients with the

Depakote Products' approved indications, such as geriatric psychiatrists, geriatricians, primary

care physicians, internal medicine physicians, and nursing home medical directors.  Thus, the

only way that the LTC Sales Force could meet the quotas was by promoting the Depakote

Products off-label.[13]

131.    The training given during the Relevant Period establishes that Defendants either

purposely violated the Company's internal polices and controls, or entirely failed to implement

such policies and controls.

**c.**    **Abbott Funds Clinical Practice Guidelines to Deceive
Healthcare Professionals**

132.    Clinical practice guidelines ("CPGs") are summaries of "expert" opinions that are

often used to identify standards of care, and are an important source of drug information for

physicians.  The potential for conflicts of interest and undue influence in the development of

CPGs, however, is rife.  While CPGs are typically formulated by panels of experts with the

support of medical professional societies, non-profit organizations, or quasi-governmental

organizations, many of these organizations are partially or fully financially supported by

pharmaceutical manufacturers.  In addition, CPG panel experts often have economic ties to the

drug industry via research grants or speaker fees.[14]

133.    Abbott's financial ties to numerous physicians and organizations that published

CPGs—and its resulting ability to taint the outcome of these purportedly independent studies—

were integral to the Fraudulent Marketing Scheme.  For example, in April 1998, McGraw-Hill

published what appeared to be independent CPGs entitled, "Treatment of Agitation in Older

---

[13] *Id.* at ¶259-61.
[14] *Id.* at ¶¶124-25.

Persons with Dementia, A Postgraduate Medicine Special Report" (the "Guidelines"), which

provided a set of dementia management guidelines for doctors treating the elderly. The

Guidelines mandated the use of Depakote, Depakote Sprinkles, and Depakote ER[15] as first-line

treatment for dementia patients, even though this was not a use approved by the FDA. Notably,

Abbott funded the Guidelines in part by "unrestricted educational grants." When the Guidelines

were updated in May 2001 and January 2005 as part of a CME series on the treatment of

dementia in the elderly, Abbott also funded the updates.[16]

134.    Moreover, among the Guidelines' "Expert Consensus Panelists" were a number of

physicians with financial relationships with Abbott, but the Guidelines failed to disclose any

such financial ties.[17]

135.    After commissioning McGraw-Hill to publish the Guidelines, and strategically

designating conflicted physicians as "Expert Consensus Panelists"—thereby ensuring that the

Guidelines would tout Depakote as the premiere treatment for dementia patients—Abbott's

management embarked on a campaign to distribute copies of the Guidelines to healthcare

professionals caring for LTC patients throughout the United States. Abbott hired Insight

Therapeutics, LLC ("Insight") to produce a pocket version of the Guidelines (the "Pocket

Guide")[18] to be used as part of CME courses that Abbott sponsored. The Pocket Guide was

supported through an unrestricted educational grant from Abbott. In addition, in 2000, Insight

prepared a CD version of the Guidelines that promoted the off-label use of the Depakote

---

[15] Depakote ER was not approved by the FDA until 2000. *Id.* at ¶129.

[16] *Id.* at ¶¶128-29.

[17] *Id.* at ¶ 131.

[18] In addition to promoting treatment of agitation and aggression associated with dementia, the Pocket Guide also promoted, *inter alia*, the Depakote Products as an alternative to atypical antipsychotics for the treatment of psychosis for patients suffering from dementia, *id.* at ¶284, and as an alternative to antipsychotics to treat "Sundowning Syndrome" in the elderly, *id.* at ¶292.

Products for the treatment of agitation and aggression associated with dementia.  Keeping with protocol, Abbott funded the CD with an educational grant.  Abbott also funded  a conversion of the Guidelines into a promotional piece entitled "Treatment of Dementia and Agitation: A Guide for Families and Caregivers" (the "Family Guide").  The Family Guide specifically promoted the off-label use of Depakote, stating that "Divalproex can help people with dementia that [sic] are showing aggression or anger."[19]

136.    Abbott's efforts were, to say the least, fruitful.  By 2000, sales of the Depakote Products nationwide grew such that an estimated 85 to 90 percent of LTC use of the Depakote Products was off-label.  In turn, an estimated 85 percent of these off-label prescriptions were for Medicaid and Medicare patients.[20]

137.    For any such guidelines made during the Relevant Period, Defendants either purposely violated the Company's internal polices and controls, or entirely failed to implement such policies and controls.

### d.    Abbott Improperly "Details" the Depakote Products

138.    The Government complaint also elaborates on Abbott's "detailing," which is the one-on-one promotion of drugs to physicians by pharmaceutical sales representatives.  Such promotions typically occurred through regular office visits when "drug reps go to doctors' offices to describe the benefits of a specific drug."  In an effort to increase sales of the Depakote Products, the Abbott LTC Sales Force engaged in numerous off-label detailing activities, including free luncheons, breakfasts, dinner meetings, preceptorships, grand rounds, mini-fellowships, and in-service training.[21]

---

[19] *Id.* at ¶¶132-36.
[20] *Id.* at ¶141.
[21] *Id.* at ¶¶142, 145.

139.     For any such marketing made during the Relevant Period, Defendants either purposely violated the Company's internal polices and controls, or entirely failed to implement such policies and controls.

### i.     Abbott Targets P&T Committees

140.     Many healthcare organizations, such as hospitals, institutional pharmacies, state Medicaid agencies, and managed care organizations, maintain lists—or "formularies"—of preferred drugs that can be prescribed by healthcare professionals within that organization or which are eligible for reimbursement by that organization.  The Pharmacy and Therapeutics ("P&T") Committee of an organization decides which pharmaceutical products are included on the formulary.[22]

141.     P&T Committees generally make formulary decisions based upon assessments of safety, efficacy, and tolerability.  In other words, P&T Committees are trained to consider patients' best interests when making a formulary decision.  Patient safety being anything but a priority to Abbott, however, Abbott's management instructed the Company's sales representatives to provide details and in-services that peddled off-label uses of the Depakote Products to P&T Committee members, as well as to single out P&T Committee members for special attention in order to influence them to add the Depakote Products to their formularies.[23]

142.     For any such training given during the Relevant Period, Defendants either purposely violated the Company's internal polices and controls, or entirely failed to implement such policies and controls.

---

[22] *Id.* at ¶146

[23] *Id.* at ¶¶146-47.

### ii. Abbott Utilizes In-Services to Promote the Off-Label Use of the Depakote Products

143. The LTC Sales Force conducted in-services for nursing home staff and for consultant pharmacists, which advocated for the off-label use of the Depakote Products.[24]

144. In addition, Abbott funded a number of CME CDs for regular use at the in-services. These CDs depicted actors pretending to be nursing home residents suffering from dementia, then showed a round table discussion among physicians—often with financial ties to Abbott—concerning treatment options for the actor patients. Not surprisingly, in each CD, the physicians arrived at the same conclusion: The Depakote Products were the treatment of choice for the elderly patient's aggression associated with dementia.[25]

145. For any illegal off-label marketing made during the Relevant Period, Defendants either purposely violated the Company's internal polices and controls, or entirely failed to implement such policies and controls.

### iii. Abbott's "Decile" Ranking System

146. The Government complaint also describes the "decile" rankings—a ranking of 1 to 10 of the overall prescribing of the Depakote Products by a physician, with 1 being the least number of prescriptions and 10 being the highest number of prescriptions—were a pivotal component of Abbott's selection of which physicians to bribe. In violation of the Anti-Kickback Act, Abbott's LTC Sales Force paid high decile physicians to perform preceptorships in order to influence them to prescribe the Depakote Products.[26]

---

[24] *Id.* at ¶ 152.

[25] *Id.* at ¶¶153-58.

[26] *Id.* at ¶159.

147.    For any such kickback given during the Relevant Period, Defendants either purposely violated the Company's internal polices and controls, or entirely failed to implement such policies and controls.

### e.    Abbott Exploits OBRA-87 Limits to Promote the Depakote Products

148.    All LTC facilities participating in Medicare and Medicaid must receive certification for compliance with federal requirements.  Under the Omnibus Budget Reconciliation Act of 1987 ("OBRA-87"), each LTC facility must employ an outside consulting pharmacist who is responsible for the quality of pharmaceutical services.[27]

149.    OBRA-87 addresses the use of anti-psychotic drugs, which are a type of psychotropic medications.  Specifically, LTC residents who had not previously used anti-psychotic drugs are prohibited from receiving these drugs unless anti-psychotic drug therapy is necessary to treat a specific condition, as diagnosed and documented in the resident's clinical record.[28]

150.    OBRA-87, however, did not classify the Depakote Products as "anti-psychotics." Consequently, according to the Government, Abbott's management developed an aggressive marketing campaign to promote the Depakote Products' off-label use as superior to psychotropic drugs—in particular, anti-psychotic drugs.  Abbott's marketing campaign highlighted: (i) the off-label use of the Depakote Products as replacements for anti-psychotics and anti-anxiety medications; and (ii) the flexibility resulting by prescribing the Depakote Products off-label, which did not exist with traditional anti-psychotics that were subject to the OBRA-87 limits.[29]

---

[27] *Id.* at ¶164; 42 CFR § 483.60.
[28] 42 CFR § 483.25(1)(2).
[29] *Id.* at ¶¶168-69.

151. For any such marketing campaign during the Relevant Period, Defendants either purposely violated the Company's internal polices and controls, or entirely failed to implement such policies and controls.

**f.      Abbott Backs the Depakote Products With Misleading Clinical Studies**

**i.      The Failed Tariot 738 Study**

152. As previously noted, Abbott had initially planned to seek FDA approval to promote the Depakote Products for aggression associated with dementia.  The Government complaint outlines how Abbott planned to support its application with the FDA with a study it commissioned known as the M97-738 Study (the "738 Study").[30]

153. The lead investigator for the 738 Study, however, was a paid Abbott consultant, Dr. Pierre Tariot.  On July 21, 1998, during the 6th International Conference on Alzheimer's Disease and Related Disorders in Amsterdam, the Netherlands, Dr. Tariot flaunted the purported impressive preliminary results of the 738 Study, stating that "[m]edicines commonly used to treat epilepsy and other seizure disorders appear to be effective at soothing the agitation in people with Alzheimer's disease and other forms of dementia," and that such medicines appear to be "as good as or better than the medicines physicians have available now to treat agitation."[31]

154. Notwithstanding Dr. Tariot's initial assertions, the 738 Study had to be terminated prior to full enrollment *due to an alarming number of participant dropouts resulting from excessive patient somnolence and weight loss.*  As such, the 738 Study was considered a "negative study" and could therefore not support a formal FDA application.  Despite the fact that

---

[30] *Id.* at ¶173.
[31] *Id.* at ¶175.

the 738 Study was never completed, it concluded that "[d]ivalproex sodium demonstrated a statistically significant effect on agitation associated with dementia."[32]

155.    Abbott was undeterred by—and, in fact, instructed its LTC Sales Force to conceal—the dangers posed by the Depakote Products.  In addition to providing thousands of reprints of the 738 Study to the LTC Sales Force for dissemination in their off-label promotion, Abbott's management trained the Company's LTC Sales Force to tell physicians that the 738 Study had demonstrated "the safety, efficacy and ease of use in treating agitation and aggression in dementia patients."  Moreover, the LTC Sales Force was instructed to state that any negative side effects reported during the 738 Study were the result of the use of too high an initial dose of the Depakote Products, and that physicians should instead "start low, go slow, titrate to clinical response."[33]

156.    For any such action taken during the Relevant Period, Defendants either purposely violated the Company's internal polices and controls, or entirely failed to implement such policies and controls.

### ii.    The Unfounded Manji Article

157.    Abbott also fraudulently promoted the neuroprotective effects of the Depakote Products in the treatment of Alzheimer's disease and other mood disorders.  A key promotional tool used by the LTC Sales Force in this off-label detail was the "Manji article," published in 2000.  The Manji Article was neither peer-reviewed nor a double-blind study.  Moreover, it was only a review of recent studies which "suggest[ed]" that the Depakote Products exhibited neuroprotective effects.  Nonetheless, Abbott's management instructed the LTC Sales Force to

---

[32] *Id.* at ¶176-77.
[33] *Id.* at ¶¶179-80.

use the Manji article to drive home the claim that the Depakote Products effectively treated Alzheimer's.[34]

158.    For any such promotion made during the Relevant Period, Defendants either purposely violated the Company's internal polices and controls, or entirely failed to implement such policies and controls.

### iii.    Abbott Illegally Sponsors the Porsteinsson 817 Study

159.    Investigator-initiated studies ("IIS") are used by drug companies to encourage physicians and clinical investigators to study their products and publish or present their findings. A legitimate IIS is generally structured such that a pharmaceutical manufacturer provides a monetary grant to a physician or clinical investigator, who, in turn, designs and conducts a clinical study on the manufacturer's product. Conversely, an IIS that is driven by a company's marketing department triggers potential liability under the Anti-Kickback Act. In addition, a manufacturer that is overly involved with an IIS could be viewed as the true "sponsor" of the trial. Thus, the trial outcome would not be independent; this lack of independence would need to be disclosed in publications, presentations, and other discussions.[35]

160.    In 2001, Abbott partially funded the M98-817 Study (the "817 Study"), an IIS authored by Dr. Anton Porsteinsson. The actions taken by Abbott in connection with the 817 Study leave no question that Abbott was in reality the "sponsor" of the study. For instance, the Government alleges that Abbott's Marketing Department was responsible for the enrollment of patients, selection of nursing home sites for study participants, and communicating with physicians and study investigators. Second, Abbott's Marketing Department went so far as to promote a contest under which nursing homes that enrolled five or more patients in the 817

---

[34] *Id.* at ¶¶ 279-80.
[35] *Id.* at ¶¶182, 184.

Study would receive a gift of their choice from Abbott.  Third, Abbott's sales representatives hosted several in-services at study sites on the off-label use of the Depakote Products.  Finally, Abbott was in charge of the 817 Study protocol, adverse event reporting, all medical issues, monitoring issues, and regulatory issues.[36]

161.    Abbott began promoting the off-label results of the 817 Study well in advance of completion of the study in order to increase the off-label uses of the Depakote Products.  When the results of the 817 Study were published in 2001, however, the 817 Study could only state that the data "suggest, ***but do not prove***, that this form of therapy can be associated with reduced agitation in some patients with dementia in the nursing home." (emphasis added).  Incredibly, Abbott provided thousands of reprints of the 817 Study to its LTC Sales Force to use in their details, specifically to counter the negative aspects of the 738 Study.[37]

162.    For any such promotion made during the Relevant Period, Defendants either purposely violated the Company's internal policies and controls, or entirely failed to implement such policies and controls.

### iv.    Dr. Tariot Reconsiders the Findings From His 738 Study, But Abbott Ignores the Truth

163.    In 2005, Dr. Tariot published a study (the "2005 Tariot Study") which found that the Depakote Products showed "no benefit" for the treatment of agitation in dementia.  Despite Dr. Tariot's earlier 738 Study's suggestion that the Depakote Products could be used in the treatment of agitation in dementia, the 2005 Tariot Study found that none of the earlier studies had proved that the Depakote Products were "efficacious for agitation in dementia," and that "[s]ome recommendations in consensus statements regarding possibly beneficial therapies are

---

[36] *Id.* at ¶¶181, 185.
[37] *Id.* at ¶¶186-87.

not supported by definitive evidence."  Notably, *at no time did Abbott's management provide reprints of the 2005 Tariot Study to sales representatives for distribution to healthcare professionals.*[38]

164.    For any such failure to distribute accurate Depakote materials during the Relevant Period, Defendants either purposely violated the Company's internal policies and controls, or entirely failed to implement such policies and controls.

> **g.      Abbott Uses Medical Journal "Supplements" to Promote the Depakote Products**

165.    Abbott also promoted the off-label use of the Depakote Products through "supplements" to medical journals.  These supplements were rarely peer-reviewed, and regularly subjected to Abbott's influence.  Examples of the promotional supplements include:

a)      "Phenomenology and Treatment of Aggression Across Psychiatric Illnesses," a 1999 supplement to THE JOURNAL OF CLINICAL PSYCHIATRY.  The authors, doctors Charles B. Nemeroff and Alan F. Schatzberg, were both paid Abbott consultants, funded by an Abbott unrestricted educational grant.  This fact was not disclosed in the supplement;

b)      "Bipolar Disorder & Impulsive Spectrum Letter, a 2001 supplement to PSYCHIATRIC TIMES.  The supplement included an article entitled "Treating Agitation in Dementia with Anticonvulsants."  The supplement was prepared by CME, Inc., and supported by an unrestricted educational grant from Abbott.  The article discussed a presentation by Dr. Alan Siegal, a paid Abbott consultant.  Again, the article failed to disclose Dr. Siegal's relationship with Abbott; and

c)      "New Strategies for Managing Dementia and Improving Medication Pass Outcomes," a 2004 supplement to the periodical Geriatrics.  The supplement was sponsored as a

---

[38] *Id.* at ¶188.

CME, the faculty at which included Tom Snader, a regular Abbott speaker. The supplement presented a case study of a patient who had been suffering from agitation related to dementia and was prescribed Depakote ER.[39]

166.    Abbott's management supplied the LTC Sales Force with reprints of the supplements for use in their promotion of the off-label use of the Depakote Products.[40]

167.    For any such "supplement" created during the Relevant Period, Defendants either purposely violated the Company's internal policies and controls, or entirely failed to implement such policies and controls.

### h.    Abbott Bribes "Key Opinion Leaders" to Increase Sales of the Depakote Products

168.    Abbott developed a core marketing strategy of identifying "Key Opinion Leaders" ("KOLs"), which were physicians who would influence their peers' prescribing behavior. In exchange for their advocacy in support of the Depakote Products, as well as marketing activities such as speaker programs and CME programs across the United States, Abbott provided the KOLs with a number of improper kickbacks, including long-term consulting agreements, sports tickets, dinners, golf outings, and speaker honoraria.[41]

169.    Abbott grouped the KOLs into three levels, depending on their status and role in marketing the Depakote Products in LTC facilities. In general, the higher the KOL level assigned to a given physician, the more valuable the kickback provided to that physician.[42]

170.    Abbott also relied on the KOLs to develop standing orders—which authorize nurses and pharmacists to administer medications according to a physician-approved protocol

---

[39] *Id.* at ¶¶189-91, 194.

[40] *Id.* at ¶193.

[41] *Id.* at ¶¶195-98.

[42] *See id.* at ¶196 (explaining that Level I KOLs—the highest level—were generally awarded long-term consulting agreements with the Company, while Level II KOLs were hired on a short-term basis).

*without first requiring the patient to undergo a physician exam*—recommending the first-line, off-label use of the Depakote Products to treat agitation and aggression related to dementia. As a result, numerous geriatric patients diagnosed with dementia who displayed agitation and aggression were subjected to the Depakote Products in the absence of a determination mandating such treatment by an unbiased physician.[43]

171. For any such bribe paid during the Relevant Period, Defendants either purposely violated the Company's internal policies and controls, or entirely failed to implement such policies and controls.

### i. Abbott Sets Up Speaker Presentations Rife With Off-Label Promotions

172. The FDA mandates that promotional presentations must be "on-label," must contain a "fair balance" of information concerning the risks and benefits of a drug, and must be truthful and not misleading.[44]

173. Abbott consistently disregarded FDA regulations by arranging hundreds of speaker programs for healthcare professionals at which off-label promotional presentations were offered. Abbott chose and negotiated with the speakers who presented, and selected the presentation topics. Not coincidentally, the speakers chosen were often also high decile prescribers of drugs to treat agitation and aggression associated with dementia. As such, the presentations often advocated for the off-label use of Depakote to treat agitation and aggression in the treatment of dementia.[45]

---

[43] *Id.* at ¶¶270-74.
[44] *Id.* at ¶199.
[45] *Id.* at ¶¶201-21.

174.    For any such presentation made during the Relevant Period, Defendants either purposely violated the Company's internal policies and controls, or entirely failed to implement such policies and controls.

### j.    Abbott Uses CMEs as Promotional Events for the Depakote Products

175.    CME courses, which usually consist of medical lectures featuring KOLs, are another key source of drug information for doctors.  The content of CME programs is intended to be independent of drug companies.  According to both the Accreditation Council for Continuing Medical Education and FDA guidance, independent educational grants cannot be tied to the purchase, sale, prescription, or recommendation of the company's products.  There cannot be price concessions to help offset a customer's purchase or reimbursement of drugs, and there cannot be any payment to ensure that the grant recipient markets the company's drugs during the educational program.  In addition, responsibility for and control over the selection of content, faculty, educational methods, materials, and venue belong solely to the CME provider in accordance with their guidelines.[46]

176.    Beginning at least as early as 1998, Abbott contracted with ABcomm, Inc. ("ABcomm") to set up CME programs using KOLs to conduct CMEs.  In violation of FDA regulations, Abbott converted the CME programs into events promoting off-label uses of the Depakote Products.

177.    Until at least the second quarter of 2005, Abbott was exclusively responsible for choosing speakers at all ABcomm meetings, which speakers were in most instances KOLs whom Abbott wanted to influence to use more of the Depakote Products for dementia treatment.  Abbott also selected the topics and slides speakers were to use, the audience who would be

---

[46] *Id.* at ¶¶222, 225.

invited to hear the presentations, the venues for the presentations, as well as negotiated speaker honoraria.[47]

178.    The motive behind Abbott's hiring ABcomm is not hard to decipher.  ABcomm was retained for the sole purpose of providing the appearance of an "arms length" transaction between Abbott and the educational program it was funding.  In other words, in the event that discussions of off-label uses of the Depakote Products arose—which Abbott ensured that they did—ABcomm's presence would make such discussions appear to be unrelated to Abbott. ABcomm was well aware of its role, and understood that its direct funding from Abbott in the form of educational grants was conditioned on the presentation of topics that interested Abbott and included speakers that spoke favorably of the Depakote Products.[48]

179.    For any such CME programs held during the Relevant Period, Defendants either purposely violated the Company's internal policies and controls, or entirely failed to implement such policies and controls.

### k.    The LTC Sales Force Falsify Medical Education Requests for Off-Label Information About the Depakote Products

180.    A "Medical Education Request" is Abbott's in-house term for a physician request for off-label information for one of Abbott's drugs.  Not satisfied with the frequency at which such requests arose in the ordinary course of business, Abbott's management instructed the LTC Sales Force to actively solicit doctors to submit Medical Information Requests for information concerning off-label uses of the Depakote Products.  LTC sales representatives, in turn, submitted the Medical Information Requests to Abbott's Medical Information Department,

---

[47] *Id.* at ¶¶228-29, 234, 281.
[48] *Id.* at ¶¶230, 232.

making it appear as if physicians had asked for this information on their own. Abbott's Medical Information Department then sent these physicians the off-label materials.[49]

181.    This practice was not only condoned by Abbott's senior management, but actually encouraged. Indeed, as described in the Government complaint, management ran sales contests to reward the sales representative who could get the most Medical Education Requests. Consequently, the LTC Sales Force improperly solicited doctors to submit thousands of Medical Education Requests for off-label information about the Depakote Products. Abbott's management was well aware that this practice constituted illegal off-label promotion, but nonetheless carried on undeterred.[50]

182.    Accordingly, for any such fraudulent Medical Education Requests submitted during the Relevant Period, Defendants either purposely violated the Company's internal policies and controls, or entirely failed to implement such policies and controls.

### 2.    The Government Launches Its Investigation Into Depakote

183.    On November 6, 2009, Abbott reported in its Form 10-Q that the Department of Justice began investigating Abbott's sales and marketing activities for Depakote. According to the disclosure, "the government is seeking to determine whether any of these activities violated civil and/or criminal laws, including the Federal False Claims Act, the Food and Drug Cosmetic Act, and the Anti-Kickback Statute in connection with Medicare and/or Medicaid reimbursement to third parties." Abbott continued using this same disclosure in each of the next two annual reports it filed with the SEC.

184.    Over the next two years, the Government continued its investigation, which included, upon information and belief, review of millions of pages of internal documents and

---

[49] *Id.* at ¶¶265-66, 268.
[50] *Id.* at ¶¶267-69.

emails as well as interviews with various current and former Abbott employees and personnel. For example, in its March 2010 proxy, Abbott disclosed that it had advanced defense costs on behalf of three former officers in connection with the Government Investigation. In its March 2011 proxy, Abbott disclosed that the Government Investigation had expanded such that the Company had advanced defense costs on behalf of two current and five former officers.

185.    Among other things, the Government sought all e-mails sent or received by thirteen individuals from 1996 through 2008 as part of its investigation into potential federal violations arising out of Abbott's impermissible off-label marketing of Depakote as a treatment for agitation and aggression in the elderly, and health care fraud arising out of that allegedly improper use. Eventually, the Government had to move to compel Abbott to produce the e-mails of three people (Defendants Dempsey, White, and Leiden), which the court granted. The emails related to Depakote and off-label marketing of other FDA approved drugs.

186.    On February 4, 2011, the DOJ elected to intervene in a whistleblower lawsuit filed in late 2008 by former Abbott sales representatives and unsealed a redacted version of its Complaint against Abbott involving the Company's illegal scheme to promote Depakote Products.

### 3.    Abbott and the DOJ Engage in "Active" Settlement Negotiations, and Abbott Sets Aside $1.5 Billion in Anticipation of Settlement

187.    By June 2011, the Company and the DOJ were in "active settlement discussions" regarding the Government Investigation, according to *Bloomberg*. Nonetheless, the Company remained quiet in its disclosures.

188.    Even in its Form 10-Q filed on August 4, 2011 Abbott did not bother to address the potential enormity of the settlement of the Government Investigation. Despite having litigated against the Government in prior Medicaid and Medicare fraud cases, and despite the

industry-wide knowledge that the Government was routinely investigating and settling such cases for hundreds of millions of dollars, Abbott only disclosed that "[d]iscussions are ongoing in an effort to resolve potential civil and criminal claims arising from this matter. Abbott is unable to predict the outcome of this matter or to estimate the range or amount of possible loss and no loss reserves have been recorded for this exposure." Nonetheless, it disclosed that "[f]or its legal proceedings and environmental exposures Abbott estimates the range of possible loss to be from approximately $85 million to $120 million."

189.    Finally, on October 19, 2011, Abbott attempted to bury the news of the reserve in a Form 8-K announcing that it was splitting into two companies, one focused on diagnostics and medical devices and the other focused on research-based pharmaceuticals. The Form 8-K also mentioned that "$1.5 billion of litigation reserves related to ongoing settlement discussions in the previously disclosed investigation by the U.S. Department of Justice, through the U.S. Attorney for the Western District of Virginia, related to Depakote." In its Form 10-Q filed November 4, 2011, Abbott disclosed that "[d]iscussions to resolve potential civil and criminal claims arising from this matter have advanced to a point where Abbott believes a loss is probable and estimable and therefore, Abbott recorded a charge of $1.5 billion in the third quarter of 2011."

190.    Based on its previous experience with fines arising out of Government investigations into fraud relating to and illegal marketing of other Company products, Defendants should have been able to estimate the range of possible loss prior to October 19, 2011 and should have begun disclosing such range as early as February 2011. Defendants also should have been able to estimate the range based on prior fines and settlements levied by the DOJ against other pharmaceutical companies and Abbott's competitors, such as Pfizer ($2.3

billion fine in 2009) and Eli Lilly & Company ($1.4 billion fine in 2009), for similar off-label marketing practices.

**G.      Defendants Were Twice Warned About Off-Label Marketing of Depakote as well as Other Drugs**

191.    In addition to the above red flags, Defendants were on notice of issues related to the off-label marketing and promotion of the Depakote Products and other Company drugs as far back as 1998.

192.    On June 26, 1998, Duane Burnham, then-CEO of Abbott, received a letter from HHS regarding Abbott's promotional materials and activities for Depacon, a Depakote Product. After review by DDMAC, HHS found that the promotional materials violated various provisions of the FDCA because they promoted non-approved uses for Depacon. Among other things the Company was requested to do was to mail and publish a pre-approved "Dear Healthcare Professional" letter addressing the HHS's concerns.

193.    Over the next ten years, Abbott would continue to receive warning letters from the FDA regarding off-label promotion and other illegal activity for other of the Company's drugs. For example, Abbott's Director, Regulatory Affairs, Advertising received a letter regarding misleading statements about Biaxin Filmtab, Granules in September 1998. In January 2001, Abbott's Associate Director, Regulatory Affairs, received a letter about misleading efficacy claims for Mivacron Injection.

194.    These letters continued to arrive even after the Abbott CIA was implemented. In October 2004, Abbott's Manager, Regulatory Affairs, received a warning letter regarding misbranding of Kaletra Capsules and Oral Suspension. In July 2005, Abbott's Associate Director, Regulatory Affairs, received a warning letter regarding misbranding of Survanta

intratracheal suspension.  In December 2008, Abbott's Regulatory Affairs Manager received a warning letter about misbranding HUMIRA Injection, Solution for Subcutaneous use.

195.    In January 2009, the Company's regulatory manager received a warning letter about misbranding of various Depakote Products.

196.    The Company continued to receive such warning letters.  For example, in July 2009, Defendant White received a second warning letter about off-label promotion of Kaletra tablets, oral solution, and capsules.

197.    These letters, in addition to the two regarding Depakote Products, show that the Company continued and perhaps continues to engage in off-label promotion of its products, inviting additional and new scrutiny by the Government and potential action taken by whistleblowers or others.

### H.    Additional Illegal Marketing Activities May Put Abbott at Risk of Exclusion from Federal Programs

198.    In 2010, Abbott settled two additional cases involving the Company's illegal marketing and sales practices.  The first, arising out of a whistleblower complaint filed by Ven-a-Care of the Florida Keys, involved additional allegations of marketing the "spread" for certain Abbott drugs and violating the False Claims Act with respect to the Company's pricing of one of its antibiotics and some of its generic, water-based solutions primarily used to facilitate the intravenous infusion or injection of other drugs.  In conjunction with this settlement, Abbott agreed to pay $126.5 million to resolve the claims.

199.    The second case Abbott settled in 2010 involved an Abbott subsidiary, Kos Pharmaceuticals ("Kos"), which Abbott had acquired in 2006.  In that case, the DOJ alleged that Kos offered and paid doctors, other medical professionals, physician groups and managed care organizations, illegal kickbacks in the form of money, free travel, grants, honoraria and other

valuable goods and services, in violation of the Anti-Kickback Statute to get them to prescribe or recommend Niaspan and Advicor. In conjunction with that settlement, Kos paid more than $41 million to resolve criminal and civil liability arising from conduct relating to its drugs Advicor and Niaspan.

200.    As acknowledged by Abbott's Code, any further illegal activity "may result in exclusion of Abbott . . . from participation in Federal Health Care Programs," a penalty which would have disastrous consequences for Abbott shareholders.

## DEMAND ON THE BOARD OF DIRECTORS
## WOULD BE FUTILE

201.    Plaintiff brings this action derivatively in the right and for the benefit of Abbott to redress the breaches of fiduciary duty and other violations of law by Defendants as alleged herein.

202.    Plaintiff will adequately and fairly represent the interests of Abbott and its shareholders in enforcing and prosecuting its rights.

203.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

204.    Current Director Defendants White, Fuller, Austin, Farrell, Scott, Tilton, Osborn, and Alpern sit on the Abbott Board, and participated in the wrongful conduct described herein. In fact, only two of the ten current Abbott directors—directors Edward Liddy and Phebe Novakovic—did not join the Board until after the Relevant Period. Plaintiff has not made a demand on the Board to institute this action because such a demand would be a futile, wasteful and useless act for the following reasons:

        a)      Each of the Current Director Defendants intentionally overlooked numerous warning signs concerning the Company's unlawful marketing practices. In particular,

the Company's drug-marketing practices have resulted in Abbott and/or its subsidiaries paying hundreds of millions of dollars in fines over the past decade, and have caused the Company to enter into several "corporate integrity" agreements during the same time period. Rather than comply with the obligations imposed upon them by these corporate integrity agreements, the Current Director Defendants consciously disregarded their fiduciary duties to Abbott by willfully turning a blind eye to the company-wide, fraudulent "off-label" marketing scheme;

b)     Every member of the Board is required to comply with Abbott's Governance Guidelines and Code. Abbott's Governance Guidelines require each of the Company's directors to "comply with all laws, rules and regulations applicable to their capacity as directors of Abbott," and to "report violations of laws, rules, regulations or the Code of Business Conduct to the Chairman of the Board and Chief Executive Officer, the Vice President and Chief Ethics and Compliance Officer, or any other appropriate Abbott personnel." The Code requires directors to "deal honestly and ethically with Abbott and with Abbott's customers, suppliers, competitors, employees and other stakeholders." The Code also requires directors to comply with: (i) "all applicable laws, rules, regulations, consent decrees and other orders of the United States Food and Drug Administration and any other similar governmental authorities"; and, (ii) "the laws relating to government health care programs in each country where Abbott does business." Each of the Current Director Defendants permitted individuals at all levels of the Company to engage in the illegal conduct described herein, thereby abdicating their fiduciary duties to, and severely damaging, the Company. As a result, each of the Current Director Defendants faces a substantial likelihood of liability for their breaches of fiduciary duties and any demand upon them is futile;

c)     During the Relevant Period, Defendants Austin, Scott, and Tilton, served as members of the Audit Committee.  Abbott's Audit Committee charter charges the members of the Audit Committee with reviewing the Company's compliance with laws, regulations, and internal procedures.  Defendants Austin, Scott, and Tilton breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee permitted the Company to repeatedly violate the laws and regulations discussed above.  The members of the Audit Committee permitted the Company to so act notwithstanding the fact that they were on notice of the Company's illicit marketing activities.  Therefore, Defendants Austin, Scott, and Tilton face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile;

d)     During the Relevant Period, Defendants Fuller and Farrell served as members of Abbott's Nominations and Governance Committee.  Abbott's Nominations and Governance Committee charter charges the members of the Nominations and Governance Committee with reviewing and assessing the adequacy of the Company's corporate governance guidelines.  Had the members of Abbott's Nominations and Governance Committee attempted even the most cursory form of such assessment, the gross failure of the Company's corporate governance guidelines would have been unmistakable.  They did not.  As a result of Defendants Fuller's and Farrell's breaches of due care, loyalty, and good faith, Abbott faces the substantial likelihood of paying well over $1 billion in fines, as well as the possibility of exclusion from participation in Federal Health Care Programs.  Therefore, Defendants Fuller and Farrell face a substantial likelihood of liability for their breach of fiduciary duties and any demand on them is futile;

e)      During the Relevant Period, Defendant Austin served as a member of

Abbott's Public Policy Committee.  Pursuant to Abbott's Public Policy Committee charter, the

members of the Public Policy Committee are charged with reviewing Abbott's policies and

practices with respect to maintaining legal, regulatory and healthcare compliance.  Defendant

Austin breached her fiduciary duty of due care, loyalty, and good faith, as the rampant

Fraudulent Marketing Scheme undoubtedly evidences that the Public Policy Committee failed to

ensure that the Company adhere to the law.  As such, Defendant Austin faces a substantial

likelihood of liability for her breach of fiduciary duties and any demand upon her is futile;

f)      The principal occupation of Defendant White is his employment with

Abbott as its CEO, pursuant to which he has received and continues to receive substantial

monetary compensation and other valuable benefits  Accordingly, Defendant White lacks

independence, rendering him incapable of impartially considering a demand to commence and

prosecute this action.

## COUNT I

### DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY FOR CAUSING THE COMPANY TO ENGAGE IN UNLAWFUL CONDUCT AND/OR CONSCIOUSLY DISREGARDING WIDESPREAD VIOLATIONS OF LAW
### (Against all Defendants)

205.    Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

206.    The Defendants all owed and owe fiduciary duties to Abbott and its shareholders.

By reason of their fiduciary relationships, Defendants specifically owed and owe Abbott the

highest obligation of good faith and loyalty in the administration of the affairs of Abbott,

including the oversight of Abbott's compliance with federal laws governing the marketing of

pharmaceuticals.  Moreover, Defendants had specific fiduciary duties as defined by the

Company's key corporate governance documents and principles that, had they been discharged

in accordance with the Board's obligations, would have necessarily prevented the misconduct and consequent harm to the Company alleged herein.

207.     Defendants were also duty-bound to abide by the CIAs—which caused the Defendants until 2008 to be regularly informed concerning the Company's compliance or noncompliance with the drug marketing laws—and expressly agreed to abide by the Code of Business Conduct requiring compliance with federal laws against improper promotion and sales practices, and against improper payment of kickbacks to healthcare professionals to induce the prescription of Abbott's drugs.

208.     The actual or permissive practice of allowing a corporate business plan of artificially increasing sales by engaging in unlawful sales and promotion practices by numerous Abbott employees for such a prolonged period of time in violation of FDA requirements, Federal healthcare program requirements and/or the Federal anti-kickback statute also violates the Defendants' fiduciary duties.

209.     As a direct and proximate result of the Defendants' conscious failure to perform their fiduciary obligations, Abbott has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.  Such damage included, among other things, the substantial penalties, fines, liabilities and expenses described herein.

210.     As a result of the misconduct alleged herein, the Defendants are liable to the Company.

## COUNT II

### DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY
### FOR WASTE OF CORPORATE ASSETS
### (Against all Defendants)

211.     Plaintiff repeats and realleges the foregoing paragraphs as set forth herein.

212.     By virtue of their ultra vires actions in violation of law, the Defendants

caused Abbott to incur and will incur hundreds of million in charges and expense as a result of

Abbott's illegal conduct in the sale and marketing of off-label Depakote.  Thereby, the

Defendants wasted Abbott's assets.

213.     As a direct and proximate result of the Defendants' breaches of fiduciary

duty, the Company has sustained, and will continue to sustain, substantial harm, including the

damages set forth herein.

214.     Abbott and its shareholders have been damaged by reason of the Defendants'

waste of corporate assets.

215.     As a result of the misconduct alleged herein, the Defendants are liable to

the Company.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff demands judgment as follows:

(a)     Determining that this action is a proper derivative action maintainable

under law and demand is excused;

(b)     Awarding, against all Defendants, and in favor of Abbott, the damages

sustained by the Company as a result of the Defendants' breaches of fiduciary and contractual

duties;

(c)     Directing Abbott to take all necessary actions to reform and improve its

corporate governance and internal procedures to comply with the Company's existing

governance obligations and all applicable laws and to protect the Company and its shareholders

from a recurrence of the damaging events described herein;

(d)     Awarding to Plaintiff the costs and disbursements of the action, including

reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

(e)     Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

Dated: January 17, 2012

Christopher J. Keller
Eric J. Belfi
Michael W. Stocker
LABATON SUCHAROW LLP
140 Broadway
New York, New York  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

Christine S. Azar
Charles B. Vincent
Peter C. Wood, Jr.
LABATON SUCHAROW LLP
300 Delaware Avenue, Suite 1225
Wilmington, Delaware  19801
Telephone: (302) 573-2530
Facsimile: (302) 573-25290

*Counsel for Plaintiff*

_____ */s/ Richard A. Saldinger* _____
Richard A. Saldinger (ARDC # 6209930)
Jeffrey L. Widman (ARDC # 6226367)
SHAW GUSSIS FISHMAN GLANTZ
WOLFSON & TOWBIN LLC
321 N. Clark, Suite 800
Chicago, Illinois  60654
Telephone: (312) 276-1321
Facsimile: (312) 980-3888
Email: rsaldinger@shawgussis.com

*Counsel for Plaintiff*

## VERIFICATION

STATE OF MISSOURI          )
                                ) ss. :

COUNTY OF JACKSON      )

Pursuant to 28 U.S.C. § 1746, I, Horace Coleman, Jr., hereby verify and declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am Chairperson for the Plaintiff, Public School Retirement System of the School District of Kansas City, Missouri ("KCPSRS"), in the above-entitled action.

2. I have reviewed the Verified Shareholder Derivative Complaint (the "Complaint") prepared on behalf of KCPSRS, and I authorize its filing.

3. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As for the allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true.

4. I further declare that KCPSRS is a current shareholder, and has been a holder, of the common stock of Abbott Laboratories during the time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

Dated: January 17th, 2012

Horace Coleman, Jr.
Chairperson